**STATE FARM FIRE AND CASUALTY COMPANY, Petitioner,**

v.

**Julie Kathleen GANDY, Individually and as Assignee of Ted Pearce, Respondent.**

**No. 94–0781.**

Supreme Court of Texas.

Argued Jan. 18, 1995.

Decided July 12, 1996.

Michael W. Huddleston, Michelle E. Robberson, Dallas, for petitioner.

Carl David Adams, Dallas, Jim Ammerman, II, Marshall, for respondent.

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, CORNYN, SPECTOR, OWEN, BAKER and ABBOTT, Justices, join.

Julie Gandy sued her stepfather, Ted Pearce, for sexually abusing her as a child. State Farm Fire and Casualty Company, which at one time had issued Pearce a homeowner's policy, agreed to pay an attorney chosen by Pearce to defend him but reserved the right to deny coverage. While the case was pending, Pearce pleaded nolo contendere to criminal charges initiated by Gandy and

was given a probated sentence of five years' imprisonment.

Without notice to State Farm, Pearce settled with Gandy by agreeing to a judgment in her favor of over $6 million and assigning her any claims he had against State Farm. In return, Gandy agreed never to try to collect the judgment from Pearce. Gandy, as Pearce's assignee, then sued State Farm to collect her agreed judgment under Pearce's policy and to recover damages for State Farm's alleged failure to defend Pearce properly.

The district court granted summary judgment for State Farm on Gandy's policy claim, holding that sexual abuse was intentional conduct not covered by the homeowner's policy and therefore State Farm never had a duty to defend Pearce. But since State Farm voluntarily undertook Pearce's defense, the court held that State Farm had a duty to conduct the defense properly. On a verdict that State Farm failed to do so, the court rendered judgment for Gandy. The court of appeals affirmed. 880 S.W.2d 129.

We hold that Pearce's assignment to Gandy violated public policy and therefore conveyed her nothing. Because she had no right to recover against State Farm except as Pearce's assignee, we reverse the judgment of the court of appeals and render judgment that Gandy take nothing.

## I

Julie Gandy was eight years old when her mother, 32, who had been divorced from her father a little more than a year, married Ted Pearce, 49, and the three of them moved to Eustace, Texas. Pearce, who had ended his formal education in the ninth grade, owned and operated a service station in nearby Athens.

In December 1988, four months before her seventeenth birthday, Gandy told her mother that Pearce had been sexually abusing her at home and at the service station for three and one-half years. Gandy also gave a statement to the district attorney. Within a few weeks, Gandy's mother filed for divorce, and the Henderson County grand jury indicted Pearce for engaging in sexual intercourse with Gandy.

About two years later, in January 1991, Gandy sued her mother and Pearce in Dallas County, alleging that Pearce had negligently and intentionally abused her and that her mother had negligently failed to prevent it. Gandy claimed actual damages of not less than $1 million for mental anguish and medical expenses, and punitive damages from each defendant equal to four times actual damages. Gandy later amended her pleadings to name as a defendant a physician Pearce had once sent her to for birth control pills.

Pearce took the papers served on him to attorney E. Ray Andrews, who was representing him in the still pending divorce and criminal cases, and Andrews agreed to represent him in Gandy's suit. Gandy's mother took her suit papers to attorney Melvin G. Bateman, who was representing her in the divorce case, and Bateman agreed to represent her.

Bateman notified State Farm, which had insured the Pearces' home beginning in September 1987 (but never the service station where some of the alleged abuse occurred), that the suit had been filed. State Farm immediately investigated Gandy's allegations and concluded that they might not be covered by its policy, but that it should nevertheless undertake the Pearces' defense. In such circumstances State Farm's procedure was to allow each insured to choose his or her own counsel. State Farm would pay both attorneys' fees. Bateman told State Farm that he would file an answer for Gandy's mother, and he did so. State Farm learned that Andrews had been representing Pearce and contacted him to inquire whether he intended to represent Pearce in Gandy's suit. Andrews advised State Farm that he represented Pearce in Gandy's suit and would file an answer on Pearce's behalf, which he did.

A month after Gandy filed suit, State Farm sent Pearce the following letter, with a copy to Andrews:

Dear Mr. Pearce:

There is a question as to whether this company is obligated to defend or indemnify you for claims arising out of the incident which is alleged to have occurred on or about March 17, 1983 at 312 West Corsicana, Athens, Texas [the address of Pearce's service station] and Highway 136 South, Eustace, Texas [the Pearces' home address].

We wish to call your attention to the fact that we specifically reserve our rights to deny coverage to you for the following reasons:

1. There is a question as to whether there was a policy in force on the date of loss.

 This question is raised due to the fact that State Farm Insurance did not provide you with a Homeowner's policy until September 8, 1987 and this loss occurred sometime in the years 1983 through 1988.

2. Coverage D, Section 2 Liability: shall not apply to Bodily Injury or Property Damage caused intentionally by or at the direction of the insured.

 The lawsuit contains allegations of intentional acts.

For these reasons, you are hereby notified that any action taken by State Farm Fire and Casualty Company or its authorized representative in investigating, negotiating, denying or defending claims arising out of such incident, shall not be considered a waiver of such policy defense or of any policy defense which may be involved in this case, nor shall such action waive any of your rights under the policy.

If we do not hear from you to the contrary, we will assume that it is acceptable for us to continue to handle the case on these terms.

State Farm sent an identical letter to Gandy's mother and her attorney. Neither of the Pearces and neither of their attorneys objected to the letter.

After Pearce received this letter he called State Farm's agent, who asked for an appointment to take his statement. Pearce said he would contact Andrews and call back. He did so on March 25, 1991, and agreed to meet with State Farm's agent three days later. When the agent met with Pearce to take his statement, Andrews was present. Pearce told the agent he absolutely denied all Gandy's allegations.

Pearce called State Farm again in June, and the agent told him she was sending a letter concerning State Farm's decision to defend him. That letter, sent to Andrews with a copy to Pearce, stated:

Dear Mr. Andrews:

Please be advised that State Farm has made the decision to defend Ted Pearce under a Reservation of Rights. The coverage questions we will continue to reserve are:

1. There is a question as to whether there was a policy in force on the date of the loss.

2. Coverage D, Section II Liability; shall not apply to bodily injury or property damage caused intentionally by or at the direction of the insured.

Additionally, the insuring agreement states:

 "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages".

To the extent that any attempt is made to impose liability on one spouse for the tort of the other, there may be no coverage.

Also, please be advised State Farm will be filing a Declaratory Relief Action, asking the court to resolve the issues of coverage in this matter.

If you have any questions with regards to the above, please feel free to contact Claim Representative Beckey Hukill at (214) 250–5214.

Neither Pearce nor Andrews called State Farm in response to this letter.

A few days later, State Farm assigned Pearce's file to another adjuster, who wrote Andrews the following letter on July 2:

Dear Mr. Andrews:

This letter is to inform you that I will be handling Mr. Ted Pearce's file in regards to the negligent allegations filed against him by Julie Kathleen Gandy.

You should direct your fee invoices to my attention for payment. Your fee invoices need to be itemized by date and activity, and calculated to the nearest tenth of an hour.

I request you keep me advised on the progress of the lawsuit from this point on. Please understand my only interest in this case is to work with you on the defense of Mr. Ted Pearce.

Please feel free to call me at any time to discuss the case.

Andrews testified that he regarded the letter as "junk mail" and did not respond to it. He never requested payment of fees from State Farm for representing Pearce. Andrews charged Pearce for representing him only in the divorce and criminal proceedings and not in Gandy's suit.

State Farm agreed to represent Gandy's mother under the same reservation of rights and agreed to pay her attorney's fees. In late June Bateman called State Farm and said that he no longer wished to represent Gandy's mother. State Farm immediately recommended other counsel to Gandy's mother, whom she agreed to have represent her. State Farm paid that lawyer's fees.

In August Pearce decided he no longer wished to have Andrews represent him in Gandy's lawsuit or in the divorce and criminal cases. Pearce secured the services of attorney Howard Pattison, who had represented him in several matters in the past. Pattison agreed to represent Pearce in all three cases. Neither Pearce, Andrews nor Pattison informed State Farm of this change. At first, Pearce and Pattison were not aware of State Farm's July 2 letter offering to pay Andrews' fees, but when they found it in the file, they still did not contact State Farm.

Meanwhile, Gandy had moved for sanctions against Pearce for failure to comply with discovery. On August 2, the district court conducted a hearing, at which no one appeared for Pearce, and signed an order requiring Pearce to respond to discovery and to pay $300 sanctions by August 31. The order warned that Pearce's failure to comply could subject him to further sanctions, including striking his pleadings and rendering default judgment against him.

Pearce did not comply, and Gandy again moved for sanctions. Pattison attended the hearing on September 30 and was formally substituted as Pearce's attorney. The court continued the hearing until November to hear evidence on the severity of sanctions to be imposed. Outside the courtroom, Gandy's attorney offered to settle with Pearce. If Pearce would assign Gandy all claims he had against State Farm and agree to a judgment, Gandy would covenant not to collect the judgment from him. Pattison communicated the offer to Pearce. Although Pattison advised Pearce that his pleadings would probably not be struck as sanctions, and although Pearce vehemently denied Gandy's allegations, Pearce decided to accept Gandy's offer because he was "fed up" with the litigation. Neither Pearce nor Pattison communicated Gandy's offer or their decision to accept it to State Farm.

In November Pearce pleaded nolo contendere to the criminal charges against him. He was sentenced to five years' imprisonment, with the sentence probated.

On December 29, 1991, Pearce signed an assignment of his claims against State Farm that provided as follows:

WHEREAS, in Cause No. 91–00426 in the 193rd Judicial District Court of Dallas County, Texas, Plaintiff Julie Kathleen Gandy has obtained a Judgment against Defendant Teddy Pearce, on January 16, 1992; and

WHEREAS, Teddy Pearce had previously advised his insurer(s) that he had accepted citation in this case, and requested that they provide him with a defense; and

WHEREAS, his insurer(s) have completely ignored Mr. Pearce's request for a defense and/or denied him a defense and denied coverage, resulting in the aforementioned Judgment; and

WHEREAS, as a result of the failure to defend and denial of coverage, Teddy Pearce is the present owner of certain purported claims, causes of action, and choses in action against State Farm Insurance Company, and/or other insurance carriers that insured Mr. Pearce in connection

with the events alleged in the Petitions filed in Cause No. 91–00426; and

WHEREAS, Julie Kathleen Gandy is willing to execute and provide to Teddy Pearce a Covenant to Limit Execution on the Judgment, in return for this Assignment of Claims;

NOW THEREFORE, Teddy Pearce does, for the consideration set forth herein and in return for the immediate execution of a Covenant to Limit Execution, and for other good and valuable consideration, hereby grant, sell, convey and assign to Julie Kathleen Gandy and her heirs and/or assigns, any and all claims that Teddy Pearce may have against State Farm Insurance Company, and/or other insurance carriers for breach of contract, negligence, breach of warranty, breach of fiduciary relationship, failure to defend, and any and all other statutory or common law claims, if any, of whatever nature, arising out of the acts and omissions of those parties as set forth herein.

FURTHER, Teddy Pearce does, for the consideration set forth herein and in return for the immediate execution of a Covenant to Limit Execution, and for other good and valuable consideration, hereby grant, sell, convey and assign to Julie Kathleen Gandy and her heirs and/or assigns, any and all claims that Teddy Pearce may have against any party arising out of the suit and claims asserted by Gandy against him.

On the same day, Pearce and Gandy signed a covenant to limit execution that provided as follows:

By this Agreement, made by and between Julie Kathleen Gandy ("Gandy"), on the one hand, and Teddy Pearce ("Pearce"), on the other hand, it is hereby agreed as follows:

It is hereby stipulated that certain claims or causes of Gandy against Pearce were the subject of that certain litigation entitled *Julie Kathleen Gandy v. Teddy Pearce, Linda Pearce and Clifford Haynes, M.D.,* which litigation was Cause No. 91–00426 on the docket of the 193rd Judicial District Court of Dallas County, Texas. It is further expressly stipulated that Gandy proceeded against and took a Judgment against Pearce, said Judgment being dated January 16, 1992. Gandy expressly stipulates that said Judgment is subject to the following provisions concerning execution or abstract of Judgment:

For and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Gandy agrees and covenants that she, and/or anyone for her or on her behalf, will limit any levy or execution or any other process, including an issuance or filing of abstract of judgment, against any assets or property, of any kind or description, of Pearce. Any such levy, execution or other process will be limited to any and all claims or causes of action of whatever nature or kind which Pearce might have or possess against State Farm Insurance Company, or any other insurance company which should have, but failed to appear and defend him, or any insurance company that otherwise has provided coverage for any liability he might have by reason of the claims asserted against Pearce in the above-referenced litigation or by reason of the Judgment.

Gandy specifically is assigned and obtains the right, from the Judgment against Pearce, to proceed against State Farm Insurance Company, and/or any other insurer(s) for recovery, or other satisfaction, of Pearce's claims against State Farm Insurance Company or the other insurer(s) for damages arising out of the facts and circumstances described herein and in Cause No. 91–00426, styled *Julie Kathleen Gandy v. Teddy Pearce, Linda Pearce and Clifford Haynes, M.D.,* in the 193rd Judicial District Court of Dallas County, Texas. Gandy further expressly obtains the right to proceed against those parties to the extent of all available insurance policies, including any that provided coverage to Pearce in connection with the matters alleged in the Petitions filed in Cause No. 91–00426, or that otherwise may provide coverage in connection with the insurer(s)' failure to defend Pearce, for breach of fiduciary duties, breach of contract, and

any other statutory or common law remedies.

As further consideration herefore, Pearce herein assigns any and all causes of action he may have against any party arising out of the suit and claims asserted by Gandy against him, including, but not limited to, any and all causes of action which Pearce may have against State Farm Insurance Company, arising out of the facts and circumstances described in the pending litigation or otherwise.

By virtue of the assignment contained herein, Pearce has specifically assigned any and all causes of action he might have or have had against State Farm Insurance Company, including but not limited to, claims or causes of action for breach of fiduciary duty, bad faith, failure to defend, or any other claim for actual, statutory, common law, or punitive damages. Pearce also expressly waives and hereby assigns to Gandy herein any right he may have had to assert any attorney-client privilege regarding any of the facts, conversations, or communications Pearce had with any of the attorneys for State Farm Insurance Company and agrees to fully cooperate and testify fully and truthfully as to all factual matters giving rise to said assigned claims, on reasonable notice of such a need for his testimony. Gandy shall hereafter be vested with full ownership of all said claims and of any right to assert or waive any attorney-client privilege regarding said claims.

Pearce also expressly waives and hereby assigns to Gandy any right he may have had to assert any husband-wife communications privilege regarding any of the facts, conversations, or communications Pearce had with Linda Pearce or with any of the attorneys representing Linda Pearce. Gandy shall hereafter be vested with full ownership of all said claims and of any right to assert or waive any husband-wife communication privilege regarding said claims.

Gandy further agrees that, upon the ultimate resolution of the claims and causes of action assigned herein, whether by settlement, judgment or otherwise, she will de-liver to Pearce a copy of the Judgment against him, endorsed by her "Paid In Full".

It is hereby stipulated by and between Gandy and Pearce that this agreement is merely a contract to limit the scope and extent of execution against Pearce, and is not a release.

. This agreement shall be governed by, construed and enforced in accordance with the laws of the State of Texas, without reference to principles of choice or conflict of laws.

The December 29 assignment and covenant both refer to a judgment dated January 16, 1992 as already having been signed, although it was not signed until the latter date. On January 9, 1992, after the assignment and covenant were signed and before the agreed judgment was signed, State Farm's adjuster called Andrews to inquire about the status of the litigation. A woman in Andrews' office told the adjuster that he had withdrawn as counsel for Pearce and that Pattison had taken over the representations. This was the first notice State Farm had received of the substitution of counsel. The adjuster then called Pattison, who told him that he had not had time to review the file and would call back.

But Pattison did not call State Farm back, and on January 16, the district court signed the following judgment:

### FINAL AGREED JUDGMENT

Being advised by counsel for both Plaintiff, Julie Kathleen Gandy, and for Defendant, Teddy Pearce, that all controversies in this matter had been settled as between them, the Court received formal, oral stipulations, which are incorporated herein by reference, from counsel for those parties regarding the terms and conditions for an agreed judgment based upon the settlement between those parties. The Court was then requested by counsel for those parties to enter an agreed judgment in the stipulated format.

The Court, having heard the stipulation of the parties, and having been informed by counsel for each of those parties that

each agreed to those stipulations, and finding it in the interest of justice that judgment as requested be entered,

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff, Julie Kathleen Gandy, have and recover from Defendant, Teddy Pearce, her actual damages of $12,500.00 for each of the three hundred and twenty-five (325) or more events or occurrences of sexual abuse, for a total award of $4,062,500.00 in actual damages, together with pre-judgment interest of ten (10%) percent per annum from January 11, 1991, until the date of this judgment, and post-judgment interest at the rate of ten per cent (10%) per annum from the date of this judgment until paid in full, and all costs of court, for which let execution issue.

IT IS FURTHER ORDERED that Plaintiff, Julie Kathleen Gandy, have and recover exemplary damages of and from Defendant, Teddy Pearce, of $2,000,000.00, together with post-judgment interest at the rate of ten per cent (10%) per annum from the date of this judgment until paid in full, for which let execution issue.

This Court further finds that no fraud or collusion has occurred in the entry of this judgment or in the circumstances surrounding the same, and specifically finds that Plaintiff did enter into a Covenant to Limit Execution with Teddy Pearce, which Covenant is in all things proper and which Covenant Plaintiff and Teddy Pearce are entitled under the circumstances to enter into, but which does not in any way effect [sic] Teddy Pearce's legal liability to pay this judgment. All relief not granted is denied.

The signatures of Gandy's lawyer and of Pearce's lawyer, Pattison, follow the signature of the district judge. Gandy nonsuited her mother and the defendant physician, making the judgment final.

Two aspects of the agreed judgment require comment. First, the recitation that "the Court received formal, oral stipulations" is incorrect. Neither the parties nor their counsel appeared before the court in connection with the signing of the judgment. Gandy's counsel gave the judgment to the court's coordinator, who presented it to the judge and returned with it signed. Counsel did not communicate with the judge in any way. Likewise, there is no basis for the findings in the last paragraph of the judgment. As Gandy's counsel concedes, the court did not have the assignment or covenant or any other evidence whatsoever before it from which it could have made findings.

Second, the court received no evidence concerning the calculation of actual damages. Gandy and her lawyer estimated 325 occurrences of sexual abuse over a two-year period (about three per week). Gandy testified that her damages were $50,000 per occurrence. Gandy's lawyer advised that damages be calculated per occurrence to assure maximum coverage by State Farm's insurance policy. However, Gandy's lawyer thought the total "was beyond what a court or jury in Dallas County would award" and more than could be justified to the court. So based upon his "personal evaluation" of the case, he arrived at the figure of $12,500 per occurrence, which he testified was "a fair evaluation of what the scope and extent of her injuries were."

State Farm first learned of the judgment on February 10, 1992. The adjuster immediately called Pattison and asked him to move to set aside the judgment. Pattison refused. State Farm's counsel also offered to continue to defend Pearce under a reservation of rights if the judgment were set aside. Again, Pattison refused.

On February 14, Gandy sued State Farm and Andrews in Harrison County, although Gandy and Pearce resided in Dallas County and Andrews resided in Henderson County. Gandy alleged that State Farm owed her the more than $6 million awarded her against Pearce. In addition, she claimed damages for State Farm's failure to defend Pearce and settle her claims against him. She alleged negligence, gross negligence, bad faith, breach of contract, and violations of the Deceptive Trade Practices—Consumer Protection Act, TEX.BUS. & COM.CODE §§ 17.41–.63, and of Article 21.21, Section 16 of the Insurance Code. Gandy also alleged that Andrews was negligent in conducting Pearce's defense, and that Andrews was State Farm's agent.

Gandy and State Farm both moved for summary judgment on her claim against State Farm's policy. The district court granted summary judgment for State Farm, holding that it had no duty to defend Pearce in Gandy's suit against him because Gandy's allegations against Pearce were not covered by State Farm's policy. The court also held that State Farm was not obligated to indemnify Pearce for the agreed judgment against him. But because State Farm had voluntarily undertaken to defend Pearce, the court held that State Farm should have done so properly and permitted Gandy to try her claim that State Farm mishandled Pearce's defense.

Gandy relied heavily on Pearce's testimony, although he steadfastly insisted, despite the agreed judgment, that he had never abused Gandy and that Gandy was a "liar". Pearce testified that he did not want Andrews to represent him in Gandy's suit but thought that Andrews was State Farm's choice. Although Gandy's mother and her attorneys had no misunderstanding in dealing with State Farm, Pearce testified that he never understood that State Farm would pay for an attorney of his choice. He testified that his limited education and experience made it impossible for him to secure competent counsel. Pearce stated that he called State Farm repeatedly to complain of Andrews, but that State Farm offered him no assistance. State Farm denies receiving any such calls and has no record of them.

Andrews also testified on Gandy's behalf. He stated that he represented Pearce in Gandy's suit out of friendship. Prior to trial, while Andrews was a defendant in the present case, he testified at his deposition that he represented Pearce in his divorce case and that he was qualified to represent Pearce in Gandy's lawsuit. A few minutes before Andrews testified at trial, Gandy nonsuited her claims against him. Andrews then testified, contrary to his deposition, that he had not represented Pearce in the divorce case and that he was not qualified to represent Pearce in Gandy's lawsuit.

Attorney Mark McMahon testified as an expert witness for Gandy that Andrews' negligent representation of Pearce caused an excessive judgment to be rendered against him. According to McMahon, despite Gandy's counsel's "fair evaluation" of her claims in the agreed judgment, had Pearce had competent counsel, the judgment against him would have been for only $1.7–2.0 million. As Pearce's assignee, Gandy claimed she was entitled to recover from State Farm the difference between the amount of the agreed judgment as calculated by her attorney and the much lesser amount to which she had really been entitled, or about $4 million.

The jury found that State Farm was negligent but not grossly negligent, and that it violated the DTPA but not knowingly. The jury found that Gandy should recover $200,000 damages, and that a reasonable attorney fee was fifteen percent of the judgment. The district court rendered judgment on the verdict against State Farm for $200,000 actual damages plus prejudgment interest, $2,000 statutory penalty, fifteen percent of the total as attorney fees, postjudgment interest, and costs.

The court of appeals affirmed. 880 S.W.2d 129. It held that Pearce was a consumer as defined by the DTPA because he sought legal services from Andrews in a transaction in which State Farm was involved. *Id.* at 134. The court also held that evidence that State Farm did not "explicitly set out the extent of its responsibility, its relationship with Andrews, or Pearce's options to select counsel of his own" was legally sufficient to support liability under the DTPA. *Id.* at 135. The appeals court held that while State Farm was not legally obligated to defend Pearce, it voluntarily undertook to do so and was obliged to use ordinary care in that undertaking. The court concluded that the same evidence that supported DTPA liability also supported liability for negligence. *Id.* at 136. Regarding damages, the court held that there was some evidence of injury to Pearce's reputation, credit and ability to conduct his business. *Id.* at 138.

The court also concluded, albeit reluctantly, that the agreed judgment was some evidence of Pearce's damages. The court was very critical of Pearce's settlement with Gandy:

The amount of the judgment in a case like this, where a covenant not to execute is given contemporaneously with and as a part of a settlement and agreed judgment, cannot constitute damage to the judgment debtor. Allowing an assignee of the named judgment debtor in such a case to collect all or part of the judgment amount perpetrates a fraud on the court, because it bases the recovery on an untruth, i.e., that the judgment debtor may have to pay the judgment. *See Whatley v. City of Dallas,* 758 S.W.2d 301 (Tex.App.—Dallas 1988, writ denied); *Garcia v. American Physicians Ins. Exch.,* 812 S.W.2d 25 (Tex. App.—San Antonio 1991) (Peeples, J. dissenting), *rev'd,* 876 S.W.2d 842 (Tex.1994). Such a result should be against public policy, because it allows, as here, parties to take a sham [5] judgment by agreement, without any trial or evidence concerning the merits, and then collect all or a part of that judgment from a third party. Allowing recovery in such a case encourages fraud and collusion and corrupts the judicial process by basing the recovery on a fiction. It is true that there is no finding of fraud or collusion between Pearce and Gandy in this case, and it is also true that Gandy was undoubtedly injured by Pearce's actions. But the fact remains that the courts are being used to perpetrate and fund an untruth—that Pearce was damaged by the bare amount of the judgment.[6]

Despite our protestations noted above, it appears that our Supreme Court is of the opinion that, even when there is a covenant not to execute, the amount of the judgment can be evidence of some damage to the one who suffered the judgment. *American Physicians Ins. Exch. v. Garcia,* 876 S.W.2d 842. It is difficult to reconcile such a view with the Supreme Court's holding that "Mary Carter" agreements are against public policy because they "skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment." *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992). To the extent that our Supreme Court would hold that the bare *amount* of the judgment constitutes damage in a case like this, we believe it is wrong, and we urge it to correct the matter when it has the opportunity. Until it does so, however, we defer to what we believe is the stated law and hold that the judgment here is some evidence of damage to Pearce, even though the judgment can never be collected from him, and is sufficient evidence to support the jury's finding.

*Id.* at 138.

[5] The judgment is a sham because it is not what it is represented to be. It cannot be collected from the judgment debtor, and that was the parties' intention when the judgment was taken.

[6] Prohibiting this type of arrangement would not inhibit settlements. The insurance company would still have an incentive to settle because it would face potential liability for damage to credit, reputation, property, and for mental anguish. Allowing recovery for the amount of the judgment is not necessary to encourage insurance companies to give careful consideration to the interests of their insureds.

*Id.* at 138 nn. 5–6.

For the reasons expressed by the court of appeals, State Farm argues that Pearce's assignment to Gandy should not be given effect. We agree, and we do not read our decision in *Garcia* to the contrary. In reaching this conclusion, we begin with a brief history of the law of alienability of choses in action, next consider certain exceptions in Texas to the general rule favoring alienability, and then explain why there must also be an exception for assignments like the one in this case. We conclude with an examination of the law in a few other jurisdictions.

## II

Alienability of choses in action has its roots in equity, not law. At early common law, a chose in action could not be assigned. *San Antonio & A.P. Ry. v. D.M. Picton & Co.,* 111 S.W.2d 842, 844 (Tex.Civ.App.—San Antonio 1938, writ ref'd); *Reef v. Mills Novelty Co.,* 126 Tex. 380, 89 S.W.2d 210, 211 (Com. App.1936); *Galveston H. & S.A. R.R. v. Freeman,* 57 Tex. 156, 157–158 (1882); 6A C.J.S. *Assignments* § 6 (1975); 6 Am.Jur.2d *Assignments* § 27 (1963); James B. Ames, *The Inalienability of Choses in Action, in*

LECTURES ON LEGAL HISTORY 210, 210–211 (1913); Walter W. Cook, *The Alienability of Choses in Action,* 29 HARV.L.REV. 816, 816 (1916); Roland F. Johnson, Comment, 17 TEX.L.REV. 183, 184 (1939). Dean Ames referred to this rule as being one "of the widest application" and "a principle of universal law." Ames, *supra,* at 210, 211. Two principal bases have been suggested for the rule. One is that the rule precluded litigation like that already prohibited by champerty and maintenance. *Id.* at 211. An early proponent of this explanation was the great Lord Coke, who declared "the aversion of the 'sages and founders of our law' to the 'multiplying of contentions and suits'". *Id.* (quoting Lampet's Case, 77 Eng.Rep. 994, 997 (K.B. 1613)). The second basis offered for the rule is that the common law regarded rights as personal. *Id.* at n. 6. Expounding on this view, Holmes argued that rights at common law (and in most early legal systems) were perceived to be relational and situational—that is, determined by the identity of the particular individuals involved and their transaction or circumstances. OLIVER W. HOLMES, JR., THE COMMON LAW 340–409 (Boston; Little, Brown, and Company 1881). A claim or cause of action was part of a right of redress that was personal to the holder by virtue of the injury suffered and thus incapable of transfer. To separate a cause of action from a particular plaintiff's right of redress was to risk unjust prosecution of claims. A right or obligation could not be enforced apart from its context without risking distortion.

As early as the fifteenth century the common-law rule against alienability of choses in action began to give way to the demand of commerce that assigned debts be enforceable. Cook, *supra,* at 821. What law courts would not oblige, chancery courts would. *Id.* For a long period of time, assignments of some debts conveyed equitable rights of enforcement but no legal rights. *Id.* Two common-law principles provided a beachhead for incursion against the rule of inalienability. One was inheritance, which expanded to include not only property rights but rights of action. HOLMES, *supra,* at 340–409. The other was attorney, the designation of a representative to act in one's stead. 2 FREDER-

ICK POLLOCK & FREDERICK W. MAITLAND, THE HISTORY OF ENGLISH LAW 227 (Boston; Little, Brown and Company 1899). In the thirteenth century only the king could appoint an attorney to conduct prospective litigation. *Id.* Over time, the right to appoint an attorney for such purposes was extended to the king's subjects, but still the law resisted its use to validate assignments because "it was thought unduly to stimulate litigation, and therefore to fall within the statutory prohibition of maintenance, unless the power was executed for the benefit of a creditor of the transferor." Ames, *supra,* at 213. Little by little, the common law's resistance to alienability of choses in action was weakening, and by the eighteenth century it had collapsed. POLLOCK & MAITLAND, *supra,* at 227; Ames, *supra,* at 213–214; Cook, *supra,* at 822–825.

The pressures against the rule of inalienability were commercial and thus affected only debts and other contract rights that were not personal to the owner and could survive to his estate upon his death. Causes of action *ex delicto* for personal torts did not survive the plaintiff's death and could not be assigned. *Freeman,* 57 Tex. at 157 (quoting *Comegys v. Vasse,* 26 U.S. (1 Pet.) 193, 213, 7 L.Ed. 108 (1828) (Story, J.)); 6 AM.JUR.2D *Assignments* § 34 (1963); Annotation, *Assignability of Right of Action Ex Delicto,* 5 A.L.R. 130, 130 (1920).

The only remnants of the rule against alienability of choses in action to survive passage of the common law to America were those pertaining to some torts. *See* Cook, *supra,* at 826–829. In Texas, the merger of law and equity allowed assigned rights to be enforced as fully as they would have been in chancery court. *See Cleveland v. Heidenheimer,* 92 Tex. 108, 46 S.W. 30, 31 (1898); Johnson, *supra,* at 184–185. Only five days after the Congress of the Republic of Texas adopted the common law, Act approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Republic of Texas Laws 3, 3–4, *reprinted in* 2 H.P.N. GAMMEL, LAWS OF TEXAS 177, 177–178 (1898) (current version at TEX.CIV.PRAC. & REM.CODE § 5.001), it provided by statute for assignment of both negotiable and non-negotiable written instruments, Act approved Jan. 25,

1840, 4th Cong., R.S., §§ 1–4, 1840 Republic of Texas Laws 144, 144–146, *reprinted in* 2 H.P.N. GAMMEL, LAWS OF TEXAS 318, 318–320 (1898) (formerly at TEX.REV.CIV.STAT.ANN. arts. 568–571 (Vernon 1935)). But even contract rights not covered by the statute could be assigned. *Kelley v. Bluff Creek Oil Co.*, 158 Tex. 180, 309 S.W.2d 208, 212 (1958); *Citizens State Bank v. O'Leary*, 140 Tex. 345, 167 S.W.2d 719, 721 (1942). In some jurisdictions the rule expanded to include claims *ex delicto* as well as *ex contractu*. An 1895 Texas statute provided that personal injury claims survived to the heirs and legal representatives of the injured party. Act of May 4, 1895, 24th Leg., R.S., ch. 89, § 1, 1895 Tex.Gen.Laws 143 (current version at TEX. CIV.PRAC. & REM.CODE § 71.021). On the theory that assignability of a chose in action depended on whether it survived the owner's death, personal injury claims thus became assignable in Texas. *See Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987). This is not true in every state. *See, e.g.*, N.Y.GEN.OBLIG.LAW § 13–101 (West 1989); *McLaughlin v. National Union Fire Ins. Co.*, 23 Cal.App.4th 1132, 29 Cal.Rptr.2d 559, 567 (1994); *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So.2d 490, 496 (Fla.Dist. Ct.App.1994); *Chiropractic Nutritional Assocs. v. Empire Blue Cross & Blue Shield*, 447 Pa.Super. 436, 669 A.2d 975, 983 (1995); *Berkowitz v. Haigood*, 256 N.J.Super. 342, 606 A.2d 1157, 1159 (Law Div.1992).

Practicalities of the modern world have made free alienation of choses in action the general rule, but they have not entirely dispelled the common law's reservations to alienability, or displaced the role of equity or policy in shaping the rule. Even today, the general rule is that a contractual assignment may be "inoperative on grounds of public policy". RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(b) (1981). The Restatement notes numerous limitations on alienation of choses in action. *Id.* ch. 15, introductory note. The increase in litigation caused by assignments, noted by Lord Coke, remains a matter of concern. So does the effect of alienability on the parties and circumstances in the original transaction or occurrence. As Holmes succinctly summarized, "[t]he history of early law everywhere shows that the diffi-

culty of transferring a mere right was greatly felt when the situation of fact from which it sprung could not also be transferred. Analysis shows that the difficulty is real." HOLMES, *supra*, at 409.

## III

This Court has held an assignment of a chose in action invalid in at least four instances. Each is based on the historical reservations to such assignments, and each relates to the current case, so we examine them in some detail.

### A

In *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex.App.—San Antonio 1994, writ ref'd), we considered "whether a client may assign his cause of action for legal malpractice arising out of litigation." *Id.* at 314. Zuniga sued Bauer Manufacturing Company and another defendant for damages he sustained when he fell from a ladder manufactured by Bauer. While the litigation was pending, Bauer's insurer became insolvent, and Bauer feared bankruptcy if Zuniga recovered a large judgment. Zuniga settled with Bauer's co-defendant for $7.5 million and then offered to settle with Bauer for an assignment of its claim against its lawyer. Zuniga contended that in response to discovery requests Bauer's lawyer had negligently admitted partial liability to Zuniga. Bauer agreed, allowed Zuniga to take a judgment against it for $25 million, and assigned Zuniga its malpractice action against its attorney. Zuniga did not covenant not to collect the judgment from Bauer, but allowed Bauer to transfer all its assets to a new corporation. Zuniga waived any right to the new company's assets, agreed that the transfer was not fraudulent, and released all claims against the individuals associated with Bauer. Zuniga then sued Bauer's attorney, asserting that he negligently represented Bauer. *Id.*

Noting that legal malpractice claims are not assignable in most jurisdictions, we observed:

Most of the authorities disallowing assignment have reasoned that to allow assignability would make possible the com-

mercial marketing of legal malpractice causes of action by strangers, which would demean the legal profession. This is a legitimate concern. We do not relish the thought of entrepreneurs purchasing the legal rights of clients against their attorneys as an ordinary business transaction in pursuit of profit.

*Id.* at 316 (footnote omitted). We also noted most of these entrepreneurs were plaintiffs who had been suing the clients:

Most legal malpractice assignments seem to be driven by forces other than the ordinary commercial market. In most of the reported cases, the motive for assignment was the plaintiff's inability to collect a judgment from an insolvent, uninsured (or underinsured) defendant.

*Id.* That was certainly true of Bauer's assignment to Zuniga, which was merely "a transparent device to replace a judgment-proof, uninsured defendant with a solvent defendant." *Id.* at 317.

We acknowledged that such assignments have two advantages: "enabling the defendant-client to extricate himself from liability, and funding the original plaintiff's judgment." *Id.* But we also identified two disadvantages. One was that "the plaintiff would be able to drive a wedge between the defense attorney and his client by creating a conflict of interest". *Id.* The threat that a plaintiff might offer to settle with a defendant for an assignment of claims against the defendant's lawyer would tend to make the defendant's lawyer less zealous in his advocacy, so as not to provoke the plaintiff, and would make the defendant and his lawyer wary of each other, disintegrating the trust relationship necessary for effective representation.

The other disadvantage to such assignments was that "the malpractice case would cause a reversal of the positions taken by each set of lawyers and clients, which would embarrass and demean the legal profession." *Id.* We elaborated on this concern:

In each assigned malpractice case, there would be a demeaning reversal of roles. The two litigants would have to take positions diametrically opposed to their positions during the underlying litigation be-cause the legal malpractice case requires a "suit within a suit." To prove proximate cause, the client must show that his lawsuit or defense would have been successful "but for" the attorney's negligence. In the malpractice suit, the Zunigas would argue that Bauer suffered judgment not on the strength of the Zunigas' claim but because of attorney negligence.

In the underlying tort case, the Zunigas' position was: we have a valid tort case involving a defective Bauer ladder, and we will win the case on the merits even if Bauer's lawyer represents it capably. But to prove proximate cause in the legal malpractice case, the Zunigas would have to take the contrary position: we would have lost our tort case and Bauer would have prevailed if its lawyers had capably defended our suit. Bauer (our assignor) would have won the defective-ladder case if only its lawyers had used due care and competence.

For the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth. It is one thing for lawyers in our adversary system to represent clients with whom they personally disagree; it is something quite different for lawyers (and clients) to switch positions concerning the same incident simply because an assignment and the law of proximate cause have given them a financial interest in switching.

*Id.* at 318 (citations omitted).

We concluded that the disadvantages to assignments of legal malpractice claims clearly outweighed the advantages.

We appreciate the goals furthered by assignment, but conclude that they do not justify the detrimental impact that assignment would have on the legal system.

*Id.* at 317. Accordingly, we held that Bauer's assignment of its cause of action to Zuniga was invalid.

## B

In *Elbaor v. Smith*, 845 S.W.2d 240 (Tex.1992), we held that Mary Carter agreements are void as against public policy. A Mary Carter agreement is any settlement arrangement between the plaintiff and some of the defendants in a case by which the settling defendants agree to pay the plaintiff a certain amount of money and to participate in the trial against the nonsettling defendants, and the plaintiff agrees to release the settling defendants from liability and, if the judgment against a nonsettling defendant is large enough, to repay the settlement amount. *Id.* at 247. In effect, the plaintiff assigns the settling defendants part of plaintiff's claim against the nonsettling defendants.

We noted two principal objections to such arrangements. First, they tend to promote litigation rather than settle it. "Although the agreements do secure the partial settlement of a lawsuit, they nevertheless nearly always ensure a trial against the non-settling defendant." *Id.* at 248. A Mary Carter agreement "creates a tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery, and thus motivates the defendant to assist greatly in the plaintiff's presentation of the case". *Id.* at 247. The settling defendants' interest in plaintiff's recovery drives the case to trial. Indeed, "Mary Carter agreements frequently make litigation inevitable, because they grant the settling defendant veto power over any proposed settlement between the plaintiff and any remaining defendant." *Id.* at 248.

Second, Mary Carter agreements distort the trial against the nonsettling defendants. The trial in *Elbaor* is illustrative. Carole Smith filed a medical malpractice suit against D/FW Medical Center, Arlington Community Hospital, and Drs. Syrquin, Elbaor, Stephens, and Gatmaitan. Smith nonsuited Dr. Gatmaitan and settled and dismissed her claim against D/FW Medical Center. She reached a Mary Carter agreement with three of the remaining four defendants, Dr. Syrquin, ACH, and Dr. Stephens, who paid her $350,000, $75,000, and $10, respectively, and agreed to participate in the trial against Dr.

Elbaor in exchange for Smith's agreement to release them from liability and to repay the settlement amounts if her recovery against Dr. Elbaor was large enough.

During the trial, the settling defendants' attorneys, who sat at the table with Dr. Elbaor's attorneys, vigorously assisted Ms. Smith in pointing the finger of culpability at Dr. Elbaor. This created some odd conflicts of interest and some questionable representations of fact. For example, although Ms. Smith's own experts testified that Dr. Syrquin committed malpractice, her attorney stated during voir dire and in her opening statement that Dr. Syrquin's conduct was "heroic" and that Dr. Elbaor's negligence caused Ms. Smith's damages. And during her closing argument, Ms. Smith's attorney urged the jury to find that Dr. Syrquin had not caused Ms. Smith's damages. This is hardly the kind of statement expected from a plaintiff's lawyer regarding a named defendant. ACH and Drs. Syrquin and Stephens had remained defendants of record, but their attorneys asserted during voir dire that Ms. Smith's damages [which she was entitled to recover] were "devastating," "astoundingly high," and "astronomical." Furthermore, on cross examination they elicited testimony from Ms. Smith favorable to her and requested recovery for pain and mental anguish. The settling defendants' attorneys also abandoned their pleadings on Ms. Smith's contributory negligence, argued that Ms. Smith should be awarded all of her alleged damages, and urged that Dr. Elbaor was 100 percent liable.

*Id.* at 246–247. Although the evidence showed that Dr. Elbaor was not nearly as involved in treating Smith as Dr. Syrquin was, the jury found, perhaps not very surprisingly, that Dr. Elbaor was 88 percent responsible for Smith's $2,253,237.07 damages. *Id.* at 242.

We determined that Mary Carter agreements "present to the jury a sham of adversity between the plaintiff and [a settling defendant], while these parties are actually allied for the purpose of securing a substantial judgment for the plaintiff and, in some cases,

exoneration for the settling defendant." *Id.* at 249 (quoting June F. Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions*, 38 U.FLA.L.REV. 521, 574 (1986)).

> The agreements pressure the "settling" defendant to alter the character of the suit by contributing discovery material, peremptory challenges, trial tactics, supportive witness examination, and jury influence to the plaintiff's cause. These procedural advantages distort the case presented before a jury that came "to court expecting to see a contest between the plaintiff and the defendants [and] instead see[s] one of the defendants cooperating with the plaintiff." [*Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 9 (Spears, J., concurring).]

*Id.* (citation omitted). We also determined that the trial court could not cure the distortion and prejudice of Mary Carter agreements by explanations and instructions to the jury. Remedial measures could "only mitigate and not eliminate the unjust influences exerted" on the trial. *Id.*

We concluded that the Mary Carter agreement was "an unwise and champertous device". *Id.*

> As a matter of public policy, this Court favors settlements, but we do not favor partial settlements that promote rather than discourage further litigation. And we do not favor settlement arrangements that skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment. The bottom line is that our public policy favoring fair trials outweighs our public policy favoring partial settlements.

> This case typifies the kind of procedural and substantive damage Mary Carter agreements can inflict upon our adversarial system. Thus, we declare them void as violative of sound public policy.

*Id.* at 250.

## C

In *International Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932 (Tex.1988), we held that a tortfeasor cannot take an assignment of a plaintiff's claim as part of a settlement agreement with the plaintiff and prosecute that claim against a joint tortfeasor. In that case, the plaintiff sued IPC and Purina for products liability and negligence, alleging that they had sold him contaminated chicken feed. Purina settled with the plaintiff and as part of their agreement took an assignment of plaintiff's claim against IPC. Purina then prosecuted plaintiff's claim against IPC. The case was tried as if the plaintiff were present, although he did not appear at trial. *Id.* at 933–934. We held that "[a]s a general rule a cause of action may be assigned, but it is contrary to public policy to permit a joint tortfeasor the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed." *Id.* at 934.

We based our decision in part on *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19 (Tex.1987), in which we held that a tortfeasor cannot completely settle a plaintiff's claim against him, take an assignment of the plaintiff's claim, and continue to prosecute a claim for contribution against a joint tortfeasor. We determined that allowing such assignments would not promote settlements and would confuse juries.

> We see no advantage in allowing defendants responsible for the plaintiff's injuries a right to, in effect, buy the plaintiff's claims and prosecute the other jointly responsible parties. It is not apparent that such settlements will result in any significant savings of time or resources. We can, however, envision that the settling defendant's unusual posture as surrogate plaintiff, co-defendant and cross-plaintiff will confuse a jury and possibly prejudice the remaining parties. . . .

> We are mindful of the general rule that a cause of action for damages for personal injuries may be sold or assigned. Our holding in the present case is an exception to this general rule. A settling defendant who is jointly responsible for personal injuries to a common plaintiff may not preserve contribution rights either by obtaining a complete release for all other parties

allegedly responsible or by obtaining assignment of the plaintiff's entire claim.

*Id.* at 22 (citations omitted).

In essence, we concluded that the assignments in these cases were invalid and conveyed no viable rights to the assignees. The Fifth Circuit applied this same logic in *Jackson v. Freightliner Corp.*, 938 F.2d 40 (5th Cir.1991), to hold that a settling tortfeasor cannot assign the plaintiff his rights of contribution and indemnity against a joint tortfeasor. *Id.* at 42. Such an assignment is also invalid.

## D

Finally, in *Trevino v. Turcotte*, 564 S.W.2d 682 (Tex.1978), we held an assignment of interests in an estate invalid. The facts of that case are important. Sarita East executed two wills before she died, one in 1948 and one in 1960. Edgar Turcotte elected to take under the 1960 will. After Edgar's death, his widow, his six sons and a large number of other people claiming an interest in the East estate contested the 1960 will. *Id.* at 684. The district court and court of appeals held that Edgar's widow and sons were estopped to contest the will because of Edgar's election to take under it. *Id.* at 685–686. Anticipating this ruling, one of the sons, Patrick, found two distant heirs of Mrs. East who received nothing under the 1960 will but would have received small cash legacies under the 1948 will, and who were willing to assign him ten percent of their interest. Patrick in turn assigned one-twelfth of the interest he received to one of his brothers, Robert. Patrick and Robert argued that they were entitled to contest the 1960 will by virtue of their assigned interests, even though they were estopped from asserting their personal claims because of their father's election. *Id.* at 687–688.

Although we observed that interests in estates are freely assignable, and that assigned interests enable assignees to contest wills, we held the assignments to Patrick and Robert invalid. The assignments distorted their real positions.

Here respondents Patrick and Robert Turcotte are seeking to assert the relatively minute interests assigned to them in order to contest the 1960 will which their father ratified by his election. Yet their admitted purpose in invalidating such will is to recover through their father since respondents are neither beneficiaries under the 1948 will nor heirs at law. In the meantime respondents have enjoyed, and continue to enjoy, the fruits of their father's election in that they remain in possession of the property taken by Edgar Turcotte under the 1960 will, and have earned almost one million dollars from same.

*Id.* at 689–690 (footnote omitted). Patrick and Robert's willingness to tender back all property received by them did not alter our conclusion "that it would be inequitable and unjust to allow Patrick and Robert Turcotte to assert standing as interested parties by virtue of the minute interests acquired through the assignments purchased for the purpose of defeating the will under which their father elected to take." *Id.* at 690.

Moreover, we noted that while the litigation was pending, Patrick's assignors settled their claims with the estate and offered to pay Patrick the ten percent due him. *Id.* at 690. We therefore concluded that "to permit standing under such circumstances is against public policy in that it would breed litigation and deprive the real parties at interest of their right to compromise and settle their controversies." *Id.* at 690.

## IV

The common law's concerns about alienability of choses in action, voiced by Lord Coke and Holmes, echo in our own decisions. In widely different contexts we have invalidated assignments of choses in action that tend to increase and distort litigation. We have never upheld assignments in the face of those concerns. With these things in mind, we turn to the assignment in this case, and others like it.

## A

■ First, Pearce's settlement with Gandy did not end the litigation, nor could there have been any reasonable contemplation that it would. Once Gandy attempted to enforce

against State Farm a $6 million agreed judgment against Pearce for sexual abuse, the likelihood of a negotiated end to the litigation was virtually nil. Even after the district court held as a matter of law that State Farm's policy did not cover Gandy's claims, and that State Farm was never obliged to defend Pearce, the litigation forged on. Had the coverage issue been resolved early on in Gandy's litigation against Pearce, it is doubtful that Gandy would have proposed settlement with Pearce on the terms she did. An assignment of Pearce's actions against State Farm for mishandling Gandy's non-covered claim would have been of no value to Gandy.

The point of this settlement was not to end the litigation but to prolong it. Had it ended simply with a judgment against Pearce, Gandy would have had little hope of ever recovering anything at all, given Pearce's impecunious circumstances. Obviously, as Gandy's counsel freely testified, the entire purpose of the arrangement was to find a way to recover against State Farm.

Second, Pearce's settlement with Gandy greatly distorted the litigation that followed. In her suit against Pearce, Gandy alleged that he sexually abused her for three and one-half years. From the beginning she claimed to be entitled to recover at least $1 million actual damages, as well as punitive damages. Her sworn statements to the district attorney and her deposition testimony consistently assert a despicable, egregious pattern of sexual abuse by her stepfather over a number of years. Gandy testified that she suffered damages of $50,000 on each occasion. When Gandy's lawyer prepared an agreed judgment, he concluded that it was unrealistic to expect the district court to render judgment for an amount equal to $50,000 per occurrence—well over $15 million in actual damages alone. His opinion as an experienced litigator in the area was that a finding of 325 separate incidents of abuse and actual damages of $12,500 per incident was "a fair evaluation of what the scope and extent of her injuries were." Had Gandy's lawyer remained of that opinion when this action against State Farm was tried, there would have been no apparent injury to Pearce. If Pearce indeed got exactly what

was coming to him in the agreed judgment, then he was not damaged by his alleged lack of competent counsel. The difference between the agreed judgment rendered against Pearce and the judgment that should have been rendered against him would be zero.

Instead, however, Gandy's position in this case is—as it must be for her to succeed—that Pearce would never have been found liable for so large an amount of damages had State Farm handled his defense properly. Even if her lawyer had testified that his "fair evaluation" of Gandy's damages was much higher than it would have been had Pearce had competent counsel, Gandy cannot avoid shifting positions. In her suit against Pearce, her incentive, fueled by belief in her cause, was to obtain as large a judgment as possible. In her suit as Pearce's assignee against State Farm, her incentive, driven by the economic realities of obtaining a judgment against a solvent defendant, is to argue that Pearce was not as liable as she earlier asserted. Inevitably, Gandy's settlement with Pearce forced her to take inconsistent positions if she was to have any hope of actually recovering anything.

Gandy was not the only party moved to alter positions. Pearce at first steadfastly denied that he abused Gandy, ever. Then, he pleaded nolo contendere to criminal abuse charges and agreed to a judgment reciting that he had abused Gandy 325 times in two years. He agreed to a judgment against himself for more than $6 million, knowing that it could not be rendered without his agreement. In the present case he returned to his prior position: he never abused Gandy. And he claims he would have been able to establish his total innocence if only State Farm had provided competent counsel to represent him. In Gandy's suit against him, Pearce opposed her as hard as he could. In Gandy's suit against State Farm, he agreed to cooperate with her.

Parties often take inconsistent positions in lawsuits. Generally the law permits this, but the situation here is different. Here the parties took positions that appeared contrary to their natural interests for no other reason than to obtain a judgment against State Farm. Gandy and Pearce arranged for an

agreed judgment to be rendered without notice to State Farm, even though State Farm had contacted Pearce's attorneys repeatedly and had instructed them to send their fee statements for payment. Gandy and Pearce obviously attempted to take advantage of State Farm. The court of appeals did not exaggerate when it called Gandy's agreed judgment against Pearce "a sham", or when it stated that the judgment "perpetrates a fraud" and "an untruth". 880 S.W.2d at 138. The agreed judgment was an essential element of the settlement allowing Gandy to prosecute Pearce's claim against State Farm. Without the assignment and covenant not to execute, the agreed judgment would never have been rendered. In these circumstances, we have no hesitation in holding that the assignment was invalid.

### B

Settlement arrangements like the one here are not unusual in cases in which plaintiffs' claims are arguably covered by defendants' insurance. They are also used in other contexts. We first discuss the cases involving insurance.

Typically in such cases, a plaintiff, $P$, asserts a claim against a defendant, $D$, who requests his insurer, $I$, to provide a defense and coverage under a policy of insurance. $I$ ordinarily has three options: to accept coverage of $P$'s claim and provide $D$ a defense, to provide a defense but reserve the right to contest coverage, or to deny coverage and refuse a defense. $D$ may accept a defense tendered with a reservation of rights, or he may insist that $I$ first accept coverage. $D$ may become concerned about the prospect of personal liability to $P$ if $I$ denies coverage, or the coverage issue remains unresolved, or $I$ mishandles the defense, or $I$ refuses $P$'s offer to settle the claim within policy limits. The principal justification for a settlement arrangement like the one in this case is that it provides $D$ a means of avoiding personal liability by assigning $P$ his claims against $I$ for coverage, negligent defense, and refusal to settle. In return, $P$ agrees to limit $D$'s personal liability. The arrangement is especially attractive to $P$ when his claim against

$D$ is weak, or when his chances of full recovery against $D$ are small.

The principal problem with the arrangement, as the present case illustrates, is that once it is made, $D$ no longer has any incentive to oppose $P$. If the agreement is struck prior to a trial of $P$'s claims, $D$ may agree to a judgment against himself, as in the present case, or may allow $P$ to take a judgment after a brief evidentiary hearing in which $D$'s participation, if any, is minimal. In a subsequent action by $P$ against $I$, $P$'s damages are measured by the value of his claim against $D$. If the issue is coverage, $P$ may be entitled to recover from $I$ what it should have recovered against $D$. If the issue is refusal to settle, $P$ may be entitled to recover his damages in excess of $I$'s policy limits. If the issue is mishandling of the defense, $P$, as $D$'s assignee, may be entitled to recover from $I$ the difference between the judgment rendered against $D$ and the judgment that would have been rendered but for $I$'s misconduct. In any case, the value of $P$'s claim against $D$ is material in the second action.

If $P$ and $D$ settle after an adversarial trial, the value of $P$'s claim can be taken to be the amount of the judgment obtained. But if settlement is before such a trial, an evaluation of $P$'s claims becomes very difficult. Appraisal of a chose in action, never an easy task because of the lack of any objective measure or market, is all the harder when $D$ ceases to oppose $P$. It is difficult enough to try to determine what $P$ would have recovered had he gone to trial against $D$; the determination is even more difficult when $D$'s opposing position must be reconstructed and its merits assessed without $D$'s cooperation.

The effort to make this determination produces a trial like the one in this case, in which the parties' positions are confused and distorted because of the settlement arrangement. Pearce swore that he never molested Gandy in any way, despite the fact that he agreed to a judgment that he sexually abused her 325 times. Gandy's lawyer swore that $4,062,500 was a fair evaluation of Gandy's damages, but Gandy's expert testified that if Pearce had been competently represented Gandy would have recovered less than half

that much. While the courts favor settlement of disputes and incline to enforcing parties' agreements toward that end, we do not do so when, as with Mary Carter agreements, the result is worse than if the parties had not settled. The settlement arrangement in the present case did not resolve the parties' disputes but prolonged and confused them. Such an arrangement is invalid.

Not every settlement involving an assignment of rights in exchange for a covenant to limit the assignor's liability has the problems we have described. For example, as we have said, if the settlement follows an adversarial trial, the difficulties in evaluating $P$'s claim are no longer present. That value has been fairly determined. We should not invalidate a settlement that is free from this difficulty simply because it is structured like one that is not.

Moreover, the difficulty in evaluating $P$'s claim is not the only consideration. It must be balanced against the advantage to $D$ of having a means of avoiding personal liability to $P$. But $D$ does not need this advantage when the prospect of personal liability can be determined beforehand. For example, when issues of coverage and the duty to defend arise, it is not unusual for $I$ or $D$ or both to attempt to adjudicate them before $P$'s claim is adjudicated. Disputes between $I$ and $D$ can often be expeditiously resolved in an action for declaratory judgment while $P$'s claim is pending. If successful, $D$ should be entitled to recover attorney fees. TEX.CIV. PRAC. & REM.CODE § 37.009; TEX.INS.CODE art. 21.55, § 6. $D$ may also be entitled to recover a penalty against $I$ equal to eighteen percent of the claim. TEX.INS.CODE art. 21.55, § 6. We recognize that prosecution of a declaratory judgment action may be burdensome to $D$, but often $I$ will assume the burden of having the issues resolved. A plaintiff who thinks a defendant should be covered by insurance may be willing to await or even assist in obtaining an adjudication of the insurer's responsibility.

■ Balancing the various considerations we have mentioned, we hold that a defendant's assignment of his claims against his insurer to a plaintiff is invalid if (1) it is made prior to an adjudication of plaintiff's claim against defendant in a fully adversarial trial, (2) defendant's insurer has tendered a defense, and (3) either (a) defendant's insurer has accepted coverage, or (b) defendant's insurer has made a good faith effort to adjudicate coverage issues prior to the adjudication of plaintiff's claim. We do not address whether an assignment is also invalid if one or more of these elements is lacking. In no event, however, is a judgment for plaintiff against defendant, rendered without a fully adversarial trial, binding on defendant's insurer or admissible as evidence of damages in an action against defendant's insurer by plaintiff as defendant's assignee. We disapprove the contrary suggestion in dicta in *Employers Casualty Company v. Block,* 744 S.W.2d 940, 943 (Tex.1988), and *United States Aviation Underwriters, Inc. v. Olympia Wings, Inc.,* 896 F.2d 949, 954 (5th Cir. 1990).

We believe this balancing of interests minimizes any hardship on an insured defendant. Determining an insurer's obligations before its insured incurs liability benefits both the insurer and the insured by removing that uncertainty. An insurer has ample disincentives to deny coverage or a defense without good reason: it will be liable for its own attorney fees in litigating the dispute and may be liable for the insured's attorney fees, a statutory penalty, and even bad faith damages. The significance of the disincentives to denying coverage and a defense without clear justification is apparent in this case. Although Pearce's sexual abuse of Gandy was clearly intentional conduct excluded from coverage under Pearce's homeowner's policy, State Farm nevertheless volunteered to pay for counsel to defend him and his wife against Gandy's claims. Pearce may have been confused about State Farm's offers to him, but there can be no question about what State Farm intended, given its defense of Gandy's mother.

We turn briefly to a consideration of the use of settlement agreements like the one before us in cases that do not involve insurance. An example is *H.S.M. Acquisitions, Inc. v. West,* 917 S.W.2d 872 (Tex.App.—Corpus Christi 1996, writ denied). There, a lessor sued her lessee for breach of a build-

ing lease. The lessee in turn sued its sublessees, contending that they were liable for all of lessor's claims. When mounting litigation costs began to concern lessee, it settled with lessor by assigning lessor its claims against the sublessees and agreeing to a substantial judgment in lessor's favor in exchange for lessor's agreement not to enforce the judgment against lessee and to indemnify lessee against claims by the sublessees. Lessor then sued the sublessees to collect its judgment against lessee. The sublessees filed third party claims against lessee. The trial court granted summary judgment for the sublessees, refusing to enforce the settlement agreement because it was collusive. *Id.* at 874–875. The court of appeals affirmed:

> We hold that the agreed judgment between [lessee] and [lessor] was executed in bad faith and is against public policy. Public policy favors reducing litigation and properly aligning adverse parties. [Lessee's] settlement with [lessor] failed to achieve these goals. Instead of reducing litigation, the settlement prolonged and confused the litigation. Rather than encouraging settlement, [lessee's] and [lessor's] actions did just the opposite.... We conclude that the agreed judgment increased the complexity of the litigation, unduly distorted the posture of the litigation, and misaligned the parties by placing [lessee] on the same side as [lessor].

*Id.* at 881.

We agree with the court of appeals. The same reasons for invalidating the assignment in the present case apply in *H.S.M.*. The factor weighing in favor of upholding an assignment in cases involving insurance—the insured's expectation that his insurer will provide a defense against plaintiff's claim— does not exist in a case like *H.S.M.* Absent such a countervailing factor, there is no reason to allow an assignment that makes litigation more protracted and complex.

There may be other circumstances in which an assignment of a chose in action to an opposing litigant in settlement of that litigant's claim does not necessitate more, and more complex, litigation. We are not able to foresee all such situations. When the considerations are those we have described here, however, we believe the assignment must be held invalid.

## C

The settlement arrangement we have examined has three elements: an assignment of a defendant insured's claims against his insurer, a covenant by the plaintiff to limit recovery from the defendant personally, and a judgment for plaintiff against defendant. Courts in other jurisdictions have considered the validity of each element as a component of the arrangement. In the present case we have focused on the validity of the assignment. Our decision follows from principles we articulated in prior cases regarding the validity of assignments of choses in action in other contexts, and from reservations that for centuries the common law has harbored about such assignments.

We do not find strong authority to the contrary in the decisions of our sister-state courts of last resort. The Tennessee Supreme Court has held that a defendant may not assign choses of action against his insurer. *Dillingham v. Tri–State Ins. Co.*, 214 Tenn. 592, 381 S.W.2d 914, 917–919 (1964); *see also Carne v. Maryland Casualty Co.*, 208 Tenn. 403, 346 S.W.2d 259, 261–262 (1961). The Rhode Island Supreme Court, by allowing only a postjudgment assignment of claims, has suggested that a prejudgment assignment would be invalid. *Mello v. General Ins. Co. of Am.*, 525 A.2d 1304, 1306 (R.I.1987) ("While we do not advocate a general policy of allowing assignment of the right to sue an insurance company for bad faith, we are convinced that in certain limited circumstances the insured's right may be assigned."); *cf. Thurston v. Continental Casualty Co.*, 567 A.2d 922, 924–925 (Me.1989); *Medical Mut. Liab. Ins. Soc'y v. Evans*, 330 Md. 1, 622 A.2d 103, 116–118 (1993); *Groce v. Fidelity Gen. Ins. Co.*, 252 Or. 296, 448 P.2d 554, 557–559 (1968); *Nichols v. United States Fidelity & Guar. Co.*, 37 Wis.2d 238, 155 N.W.2d 104, 108–110 (1967) (all upholding a postjudgment assignment without discussing validity of prejudgment assignments). Courts of last resort in five states, Arizona, Iowa, Kansas, Massachusetts, and Pennsylvania, have allowed an assignment like the

one in this case. *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997, 999 (1969); *United Servs. Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246, 251–252 (1987); *Red Giant Oil Co. v. Lawlor,* 528 N.W.2d 524, 531–534 (Iowa 1995); *Glenn v. Fleming,* 247 Kan. 296, 799 P.2d 79 (1990); *Campione v. Wilson,* 422 Mass. 185, 661 N.E.2d 658, 662–663 (1996); *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 223 A.2d 8, 12–13 (1966). It appears that the New Jersey Supreme Court would also uphold such assignments. *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163, 174–175 (1982). Courts that allow assignments have attempted to craft procedures to prevent the use of an unreasonable or collusive judgment to establish post-assignment damages.

California appears to have more reported appellate court decisions on the validity of settlement arrangements like the one before us than any other jurisdiction in the country. Postjudgment assignments of refusal-to-settle claims were squarely approved by the California Supreme Court in *Comunale v. Traders & General Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198, 202 (1958). *See also Brown v. Guarantee Ins. Co.,* 155 Cal.App.2d 679, 319 P.2d 69, 77–79 (1957). The court again enforced such an assignment in *Johansen v. California State Automobile Association Inter–Insurance Bureau,* 15 Cal.3d 9, 123 Cal. Rptr. 288, 295–296, 538 P.2d 744, 751–752 (1975). On the other hand, prejudgment assignments of insureds' claims against their insurers have never won the same judicial approval. An early decision of the California Court of Appeal, *Critz v. Farmers Insurance Group,* 230 Cal.App.2d 788, 41 Cal.Rptr. 401 (1964), broadly rejected arguments that such assignments led to collusion and violated public policy. *Id.* 41 Cal.Rptr. at 407–410. But the circumstances of that case do not support a broad reading of the court's opinion. Although the assignment in *Critz* preceded rendition of judgment against the insured, judgment was rendered after a jury trial at which defendant offered evidence in opposition to plaintiff's claim. *Id.* 41 Cal. Rptr. at 403. Thus, the possibilities of unfairness and collusion in the settlement arrangement were not fully apparent in *Critz.* In *Doser v. Middlesex Mutual Insurance*

*Co.,* 101 Cal.App.3d 883, 162 Cal.Rptr. 115 (1980), the court held that a defendant's assignment of claims against his insurer conveyed nothing unless judgment was rendered against the defendant. *Id.* 162 Cal.Rptr. at 119. A settlement between plaintiff and defendant in which they merely agreed that defendant owed a certain amount did not give rise to an assignable claim. The court recognized the problems with collusion in a simple agreement but did not consider the likelihood of similar problems in a judgment rendered without any opposition by defendant. In 1981 the California Supreme Court held that "an insured breaches no duty to the insurance company when he assigns his rights against the company to the injured plaintiffs in return for a covenant not to execute." *Samson v. Transamerica Ins. Co.,* 30 Cal.3d 220, 178 Cal.Rptr. 343, 356, 636 P.2d 32, 45 (1981). The court noted, however, that the insurer could point to no evidence of collusion or unreasonableness. *Id.,* 178 Cal.Rptr. at 357, 636 P.2d at 46.

More recently, California appellate courts have backed away from the broad endorsements of *Samson* and *Critz* in the face of various problems with such assignments. In *Smith v. State Farm Mutual Automobile Insurance Co.,* 5 Cal.App.4th 1104, 7 Cal. Rptr.2d 131 (1992), the court held that rendition of judgment against defendant was a precondition of his right to assign plaintiff claims against his insurer, and that a stipulated judgment did not suffice to meet this condition. The court stated: "we recognize policy considerations for disallowing assignments of a bad faith action prior to judgment which override the countervailing policy considerations in the *Critz* decision." *Id.* 7 Cal. Rptr.2d at 136. Similarly, in *Xebec Development Partners, Ltd. v. National Union Fire Insurance Co.,* 12 Cal.App.4th 501, 15 Cal. Rptr.2d 726 (1993), the court held that a "stipulated judgment … obtained on the basis of the settlement in uncontested proceedings in which [the insurer] did not participate" did not establish the insured's liability in a statutory bad faith action. *Id.* 15 Cal.Rptr.2d at 768.

*Smith*'s disapproval of such settlement arrangements was softened slightly in *Wright*

*v. Fireman's Fund Insurance Cos.,* 11 Cal. App.4th 998, 14 Cal.Rptr.2d 588 (1992), in which the court concluded that "[a] judgment on the merits ... is not *always* required and insurers have been bound by default and stipulated judgments under certain circumstances." *Id.* 14 Cal.Rptr.2d at 598 (emphasis added). But *Wright* was as concerned as *Smith* about the problems with these settlements. "We are frankly disturbed," the court wrote, "by the potential for abuse apparent in a situation where an insurer, in the absence of a breach of its duty to its insured, could be bound by a consent judgment...." *Id.* 14 Cal.Rptr.2d at 600. The court added: "With no personal exposure the insured has no incentive to contest liability or damages. To the contrary, the insureds' best interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible for those damages." *Id.* at 603. More than the *Smith* court, the *Wright* court tried to balance both the insured's and the insurer's interests, concluding:

> In summation we hold that where an insurer provided a defense to its insured in the underlying litigation, and the insured, without the participation or consent of the insurer, stipulated to a judgment without evidentiary support and with no potential for personal loss, such judgment is insufficient to impose liability on the insurer in a later action against the insurer.... To hold otherwise would create in the insured the ability to escape all liability for his or her own wrongdoing while imposing on the insurer totally unsupported liability. The potential for fraud and collusion is evident.

*Id.* 14 Cal.Rptr.2d at 603–604 (footnote omitted).

*Wright* seems to have marked a shift in focus on the elements of the settlement arrangement. Since *Wright,* the principal concern of California courts appears not to be whether an assignment was valid, but whether a judgment rendered absent adversarial proceedings was fair and reasonable and free of fraud and collusion. In *Sanchez v. Truck Insurance Exchange,* 21 Cal.App.4th 1778, 26 Cal.Rptr.2d 812 (1994), the court held that an insurer which has wrongly refused to tender a defense for its insured cannot escape liability for a judgment rendered against its insured as part of a settlement, as long as the judgment was taken in good faith and without fraud or collusion. *Id.* 26 Cal.Rptr.2d at 818. *McLaughlin v. National Union Fire Insurance Co.,* 23 Cal.App.4th 1132, 29 Cal. Rptr.2d 559 (1994), moves even further from *Smith,* but in unique circumstances. There the court upheld the insureds' assignment of a claim against their insurer for wrongful cancellation of a policy. Contrasting *Smith,* the court reasoned:

> While we appreciate the policy concerns which fueled the *Smith* decision, in our view the emerging rule is too rigid. *Smith* would never recognize a stipulated judgment coupled with a covenant not to execute, and signed only by the insured and the claimant, as supporting assignment to the claimant of the insured's bad faith action against the insurer.

> The countervailing policy concerns explored in *Critz,* namely, those in favor of settlement and equalization of insured's and insurer's strategic advantages, are also important. Each case develops its own dynamic and has its own mix of procedures and circumstances which should be evaluated to determine whether the problems of collusion and prejudice are substantially diminished in that case. We summarize the factors present in this case which lead us to conclude that plaintiffs could legitimately proceed against [defendants' insurer] as assignees of the insured tortfeasors.

> First, while liability was stipulated rather than adjudicated, the amount of damages was not....

> Second, the judgments were entered after the summary judgment motions of [the defendant insureds] were denied [thus indicating that there were triable facts as to their liability to plaintiff]....

> Third, although the covenant not to execute eliminated personal financial exposure for the judgments, the personal judgments still stand and can adversely affect the future credit and business transactions of the insureds....

> Fourth, [the insurer] had notice of the underlying litigation against the insured[s]

... and was aware they might stipulate to liability. Counsel for the [insureds] urged and invited [the insurer] to participate and negotiate a settlement....

Finally, *[the insurer] encouraged [its insureds] to enter stipulations of liability with protective covenants and therefore is estopped from attacking the validity of the judgments....*

*Id.*, 29 Cal.Rptr.2d at 571–572 (emphasis added). The last factor, estoppel, makes *McLaughlin* unique. That one factor alone would seem enough to justify holding the insurer to a stipulated judgment against its insured. The court used the other four factors to determine whether the judgment was fair and reasonable and free from fraud and collusion.

In *Roman v. Unigard Insurance Group,* 26 Cal.App.4th 177, 31 Cal.Rptr.2d 501, 504–505 (1994), and *National Union Fire Insurance Co. v. Lynette C.,* 27 Cal.App.4th 1434, 33 Cal.Rptr.2d 496, 503–506 (1994), the courts held that an insurer will be liable for an agreed judgment against its insured if the trial court found the judgment to be taken in good faith. California procedure allows a trial court in certain circumstances to conduct a hearing on whether a settlement has been reached in good faith. The appellate courts held that a trial court's approval of an agreed judgment after such a hearing would ordinarily be sufficient to preclude the possibility of collusion or unfairness. But the court in *Pruyn v. Agricultural Insurance Co.,* 36 Cal.App.4th 500, 42 Cal.Rptr.2d 295 (1995), disagreed. The *Pruyn* court pointed out that a hearing on the fairness of an agreed judgment would ordinarily involve only a plaintiff and defendant and not defendant's insurer. An insurer would be denied procedural due process, suggested *Pruyn,* if it were bound by a trial court's decision in which it did not and could not participate. *Id.* 42 Cal.Rptr.2d at 310–311; *see Hartford Acc. & Indem. Co. v. Superior Court,* 37 Cal.App.4th 1174, 44 Cal.Rptr.2d 126, 132–133 (1995).

*Pruyn* follows the approach of *Wright* and *McLaughlin.* "[C]ourts focus on whether the facts have been adjudicated independently in a process that does not create the potential for abuse, fraud or collusion." *Id.* 42 Cal.Rptr.2d at 304. "To be sure, a stipulated or consent judgment which is coupled with a covenant not to execute against the insured brings with it a high potential for fraud or collusion." *Id.* at 305. On the other hand, "[a]n insurer which has wrongfully abandoned its insured should not be heard to complain or allowed to relitigate the trial court's judgment merely because the default or uncontested proceedings followed, and were related to, an agreement between the insured and the claimant." *Id.* at 304.

*Pruyn* prescribes the procedure for determining whether an insurer is bound by a judgment agreed to between its insured and a plaintiff suing the insured.

We ... hold that when, as plaintiff alleges happened here, a liability insurer wrongfully denies coverage or refuses to provide a defense, then the insured is free to negotiate the best possible settlement consistent with his or her interests, including a stipulated judgment accompanied by a covenant not to execute. Such a settlement will raise an evidentiary presumption in favor of the insured (or the insured's assignee) with respect to the existence and amount of the insured's liability. The effect of such presumption is to shift the burden of proof to the insurer to prove that the settlement was unreasonable or the product of fraud or collusion. If the insurer is unable to meet that burden of proof then the stipulated judgment will be binding on the insurer and the policy provision proscribing a direct action against an insurer except upon a judgment against the insured after an "actual trial" will not bar enforcement of the judgment.

*Id.* 42 Cal.Rptr.2d at 299. To be entitled to a presumption

an insured should be required to establish certain basic or foundational facts. We believe they are three in number: (1) the insurer wrongfully failed or refused to provide coverage or a defense, (2) the insured thereafter entered into a settlement of the litigation which was (3) reasonable in the sense that it reflected an informed and good faith effort by the insured to resolve the claim.... The nature of the evidence

which would demonstrate the first two basic facts requires no discussion; however, some comment as to the third is appropriate.

The insured can satisfy its prima facie burden of showing that the settlement was reasonable by presenting ... evidence which would support a determination of good faith.... "Good faith" ... requires "the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries.... [A] number of factors [must] be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants."

*Id.* at 312 (quoting *Tech–Bilt, Inc. v. Woodward–Clyde & Assocs.*, 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159, 170 (1985)). If an insured shows that he is entitled to this presumption,

the burden of proof will shift to the defendant insurers to persuade the trier of fact, by a preponderance of the evidence, that [the] settlement did not represent a reasonable resolution of plaintiff's claim or that the settlement was the product of fraud or collusion. The principles of fraud and collusion are self-evident and require no extended discussion. The facts and circumstances which will lead a court to conclude that either are present are limited only by the imagination of those who would cheat and deceive.

*Id.* at 313–314 (footnote omitted).

The procedure required by *Pruyn* to enforce an agreed judgment against an insurer is, to be generous, complicated. Its goal is to determine what judgment would have been rendered against an insured, or what settlement he would have agreed to, had he remained personally liable to plaintiff. Put another way, the inquiry is what result would plaintiff and defendant have reached had they remained fully adversarial to the end. The validity of the holdings in *Griggs,* 443 A.2d at 163 (New Jersey), *Red Giant,* 528 N.W.2d at 524 (Iowa), and other cases that uphold prejudgment assignments of claims against insurers is based on the premise that this inquiry is answerable. We think it is not, and that *Pruyn* shows why. It is one thing to *say* that a defendant's liability must be determined as if he had not settled with the plaintiff; it is quite another thing to *do* it. We think *Pruyn's* listing of factors to be considered in the process of assessing a defendant's liability after he has settled shows that the undertaking is virtually impossible. Once the parties have changed positions, their views are altered, and it is very difficult to determine what might have been.

■ We believe this inquiry should ordinarily be avoided, absent compelling reasons to the contrary, and the limited rule we have adopted in Part IV–B above does so. As we have said, we do not address whether an assignment is invalid when any element of the rule is lacking, such as when an insurer has not tendered a defense of its insured. Adjudication of an insurer's obligations before determination of the defendant insured's liability to the plaintiff removes the justification for a settlement like the one in this case in most instances. In no event should a judgment agreed to between plaintiff and defendant be binding on defendant's insurer. If an insurer's liability is to be litigated in an action by a plaintiff as a defendant's assignee after such a judgment is rendered, it should be done on the strength of plaintiff's claims rather than the generosity of defendant's concessions.

### V

■ As a rule, our decisions apply retrospectively. *Elbaor,* 845 S.W.2d at 250. There are exceptions, determined mostly by three factors:

(1) whether the decision establishes a new principle of law by either overruling clear

past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether prospective or retroactive application of the particular rule will further or retard its operation through an examination of the history, purpose, and effect of the rule; and (3) whether retroactive application of the rule could produce substantial inequitable results.

*Id.* (citing *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 518 (Tex.1992) (quoting *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971))). As in *Elbaor*, we believe that the first and third factors weigh heavily in favor of limiting the retroactive effect of today's decision. We conclude, as we did in *Elbaor*, *id.* at 251, that today's holding applies in this case, in pending cases in which complaint of an assignment has been preserved, and to every such assignment executed after today. It does not invalidate assignments to which an objection has not been preserved.

\* \* \* \* \* \*

For the reasons explained, we reverse the judgment of the court of appeals and render judgment that plaintiff take nothing.

ENOCH, Justice, concurring.

I concur in the Court's judgment and parts I, II, III, IV(A), and V of the opinion. The focus of this case is on whether Pearce can assign his claim against his insurance company for breach of its duty to defend. The essence of Pearce's claim is that had he been properly defended, he would have received a more favorable result in his lawsuit. This is analogous to a legal malpractice claim. Consequently, *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313 (Tex.App.—San Antonio 1994, writ ref'd) resolves the question. The assignment of Pearce's claim is invalid.

The Court, however, goes beyond this simple resolution. Its discussions in parts IV(B) and (C) move beyond criticism of assignments of claims in duty to defend cases and attack prejudgment assignments in insurance cases generally. Furthermore, the Court imports into its opinion language from *H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872

(Tex.App.—Corpus Christi 1996, writ denied), a case that does not involve an assignment of a chose in action. The Court need not enter into these additional discussions to resolve this case, and I am not confident that the conclusions implicit in these discussions are correct.

The Court's judgment is correct. Thus, I concur.