**CORONADO PAINT COMPANY, INC. and KTA–Tator, Inc., Appellants,**

v.

**GLOBAL DRYWALL SYSTEMS, INC. and Global Drywall Systems, Inc., as Assignee of Bridgepoint Condominiums—Phase I, Appellees.**

No. 13–98–479–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 22, 2001.

Rehearing Overruled May 3, 2001.

Audrey Mullert Vicknair, Paul W. Nye, Roberta Dohse, Chaves, Gonzales & Hoblit, Corpus Christi, Nancy Hesse Hamren, Barry Stephen Rabon, Houston, Eileen

Leeds, Willette, Guerra & Trevino, Brownsville, for appellant.

Henry J. Ackels, Robert Jordan Scott, Dallas, for appellee.

Before: Justices DORSEY, RODRIGUEZ, and CHAVEZ.[1]

## OPINION

DORSEY, J.

Appellants, Coronado Paint ("Coronado") and KTA–Tator, Inc. ("KTA"), appeal a money judgment entered after a jury found in favor of Global Drywall Systems, Inc., both in its own capacity, and in its capacity as assignee of Bridgepoint Condominiums.

### FACTS

This case is about a faulty paint job. Bridgepoint Condominiums, a high-rise condominium project in South Padre Island, Texas, hired Global Drywall Systems, Inc. to paint the exterior of the condominium project for $600,000.00. As part of the contract, Global provided certain warranties to Bridgepoint. Global warranted the paint job for a five-year period, and agreed to perform annual inspections and repairs. Additionally, if any defects in the paint job affected more than 1% of the entire project, Global agreed to repaint the entire building.

Bridgepoint also retained a company called KTA–Tator, Inc., an engineering firm that specialized in paint applications and processes, to prepare the specifications for the project. The specifications dictated the types of paints and procedures to be used. KTA was also retained to perform periodic inspections of the project. KTA was paid $100,000.00 for its services. In accordance with KTA's speci-fications, Coronado Paint Company supplied the paint for the project. Coronado also provided a five-year warranty on the paint, subject to certain exclusions. Coronado was paid approximately $24,000.00.

Global completed the painting in October of 1992. The next year, problems arose. The paint displayed visible peeling, flaking, blistering, and corrosion. Bridgepoint notified both Global and Coronado Paint about the problems. After examining the building, each blamed the other. Coronado Paint said the problem was caused by Global's work, and Global said Coronado's paint caused the problem. Neither repaired the problem, and the building remained in the defective condition.

In 1995, Bridgepoint sued Global for breach of contract and breach of warranty. Global counterclaimed against Bridgepoint, and filed third-party actions against Coronado Paint and KTA. In late 1996, without abandoning its claims against Global, Bridgepoint added similar claims directly against Coronado Paint and KTA. Eventually, Bridgepoint (i.e., the "original" plaintiff) settled with Global (i.e., the "original" defendant). As part of the settlement, Bridgepoint assigned to Global all of its claims against Coronado Paint and KTA.

The case was tried in 1998. The trial court did not allow mention of the assignment of Bridgepoint's causes of action to Global. Rather, the case was tried as if Bridgepoint were still a party. The jury found Coronado Paint and KTA liable for all the damage. It awarded to Global $48,408.93 in actual damages and $388,681.25 in attorneys' fees. It further awarded to Global as assignee of Bridgepoint's claim, $240,000.00 in actual damages, $1.75 million in punitive damages,

---

1. Senior Justice Melchor Chavez assigned to this court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1998).

and $131,528.29 in attorneys' fees. Both Coronado Paint and KTA (collectively, "appellants") appeal from this judgment.

Appellants contend that the assignment of Bridgepoint's claims to Global was invalid because it violates public policy. At a minimum, they argue, the trial court committed harmful error by refusing to allow the jury to hear evidence regarding the assignment. We hold that the assignment is void because it constituted a Mary Carter agreement, banned by *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992), and violated the joint tortfeasor exception to the general rule of free assignability of causes of action, contravening *International Proteins, Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988). *See also Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19 (Tex.1987).

## Validity of the Assignment

■ Generally, causes of action may be freely assigned. *See State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 705–707 (Tex.1996). But while the "[p]racticalities of the modern world have made free alienation ... the general rule, ... they have not entirely dispelled the common law's reservations to alienability, or displaced the role of equity or policy in shaping the rule." *Id.* at 707. Thus, an assignment may be invalidated by the courts if found to offend public policy. *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(b) (1981)). Historically, "the difficulty of transferring a mere right [to pursue a cause of action] was greatly felt when the situation ... from which it sprung could not also be transferred." *Id.*

2. *See Gandy,* 925 S.W.2d at 714.

3. *See Zuniga v. Groce, Locke & Hebdon,* 878 S.W.2d 313, 318 (Tex.App.—San Antonio 1994, writ ref'd.).

4. *See Elbaor,* 845 S.W.2d at 250.

(citing OLIVER W. HOLMES, JR., THE COMMON LAW 409 (1881)).

■ The Texas Supreme Court has held that several types of assignments are invalid because they violate public policy. Those are (1) an assignment of a cause of action that works to collude against an insurance carrier;[2] (2) an assignment of a legal malpractice claim;[3] (3) an assignment that creates a Mary Carter agreement;[4] (4) an assignment of the plaintiff's cause of action to a joint tortfeasor of the defendant;[5] and, (5) an assignment of interests in an estate that distorts the true positions of the beneficiaries.[6] In all these cases, the evil sought to be avoided is a distortion of the parties' positions so that they have incentives not generally associated with their positions in the litigation. *Accord Elbaor,* 845 S.W.2d at 249.

The supreme court's rulings in *Elboar v. Smith* and *International Proteins Corp. v. Ralston–Purina Co.* are controlling. *See Elboar v. Smith,* 845 S.W.2d at 250; *International Proteins Corp.,* 744 S.W.2d at 934. In *International Proteins,* the Texas Supreme Court held that a joint tortfeasor may not take an assignment of a plaintiff's cause of action against the other defendants as a part of the settlement of a lawsuit. *International Proteins,* 744 S.W.2d at 934. It stated that while "[a]s a general rule a cause of action may be assigned, ... it is contrary to public policy to permit a joint tortfeasor the right to purchase a cause of action from a plaintiff to whose injury the tortfeasor contributed." *Id.* We believe the Bridgepoint–to–Global assignment fails squarely within this prohibition.

5. *See International Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, 934 (Tex.1988); *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19 (Tex.1987).

6. *See Trevino v. Turcotte,* 564 S.W.2d 682 (Tex.1978).

We see no meaningful distinction between the alignment of the parties in *International Proteins* and the alignment of Bridgepoint and Global. Global argues that because Bridgepoint's original cause of action against Global for breaching the painting contract sounded in contract and warranty theories rather than tort theories, it cannot be a joint tortfeasor with Coronado and KTA. We construe the rule in *International Proteins* to apply not solely to joint *"tort* feasors," but also to joint wrongdoers, regardless of whether the claim sounds in tort or contract theories, if the parties are alleged to have caused one indivisible injury to the plaintiff.

■ This assignment also runs afoul of the supreme court's prohibition of Mary Carter agreements. In *Elboar*, the court declared Mary Carter agreements to be "void as violative of sound public policy." *Elbaor*, 845 S.W.2d at 250. A Mary Carter agreement is an agreement whereby a "settling defendant retains a financial stake in the plaintiff's recovery *and* remains a party at the trial of the case." *Id.* (emphasis in original).[7] Calling Mary Carter agreements "inimical to the adversary system," the court explained that they "pressure the 'settling' defendant to alter the character of the suit by contributing discovery material, peremptory challenges, trial tactics, supportive witness examination, and jury influence to the plaintiff's cause." *Id.* at 248–49. Ultimately, Mary Carter agreements "present to the jury a sham of adversity between the plaintiff and one co-defendant, while these parties are actually allied for the purpose of securing a substantial judgment for the plaintiff and, in some cases, exoneration for the settling defendant." *Id.* at 249 (citing June F. Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions*, 38 U.FLA.L.REV. 521, 574 (1986)). The central problem is the distortion that occurs to "the case presented before a jury that came 'to court expecting to see a contest between the plaintiff and the defendants [and] instead see[s] one of the defendants cooperating with the plaintiff.' " *Gandy*, 925 S.W.2d at 710 (quoting *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 9 (Spears, J., concurring)).

The assignment from Bridgepoint to Global meets the definition of a Mary Carter agreement set forth in *Elbaor*. *Elbaor*, 845 S.W.2d at 250. Global, the original defendant, settled with Bridgepoint, the original plaintiff. The assignment clearly created a financial stake for Global in Bridgepoint's recovery, satisfying the first prong of *Elbaor*. Also, while Global and Bridgepoint dismissed their causes of action against each other, Global remained a party in the case at trial.

In *Elbaor*, the court explained that "[t]he participation requirement is satisfied by the mere presence of the settling defendant as a party in the case." *Elbaor*, 845 S.W.2d at 257, n. 14. The trial court realigned the parties after Bridgepoint dismissed its claims against Global, and Global became—in a sense—both plaintiff and "co-plaintiff." That is, Global became the plaintiff when it stepped into the shoes of Bridgepoint as Bridgepoint's assignee.

---

7. In *Elbaor,* the court sought to "definitely define the requisite elements of a Mary Carter agreement." *Elbaor*, 845 S.W.2d at 247. It defined it in the broad terms stated above, but described an example of a Mary Carter Agreement:

A Mary Carter agreement exists, under our definition, when the plaintiff enters into a settlement agreement with one defendant and goes to trial against the remaining defendant(s). The settling defendant, who remains a party, guarantees the plaintiff a minimum payment, which may be offset in whole or in part by an excess judgment recovered at trial.

*Id.* The court did not *limit* its definition to that scenario.

Global also became a plaintiff in its own capacity after the realignment. However, the fact that the parties were realigned does not change the fact that Global remained a party who actively participated in the trial of the cause. We believe this meets the *Elbaor* "participation" requirement. *Id.* We hold that the Bridgepoint-to-Global assignment falls within the prohibitions outlined in *Elbaor*. Because we find that the assignment is an impermissible Mary Carter agreement which also violates the rule set forth in *International Proteins v. Purina*, we hold it void. Having found the assignment void, we now consider the proper disposition.

### DISPOSITION

 KTA and Coronado brought a motion for judgment nov that requested the trial court to disregard the jury's answers to several questions because the assignment from Global to Bridgepoint was invalid as a matter or law. A court may render judgment non obstante veredicto if a directed verdict would have been proper. TEX.R.CIV.P. 301. A directed verdict is proper if the substantive law does not permit the plaintiff to recover on its cause of action. *See Arguelles v. UT Fam. Med. Center,* 941 S.W.2d 255, 258 (Tex.App.—Corpus Christi 1996, no writ). Thus, judgment non obstante veredicto is appropriate where the court can determine as a matter of law that a claim or defense included in the jury charge is or is not viable. 6 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 47.13 (2d ed.1998). When the court submits a question of law to the jury, the jury's answer may be

disregarded as immaterial. *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994).

 The question of whether the assignment was invalid is a question of law. *See Vinson & Elkins v. Moran,* 946 S.W.2d 381, 397 (Tex.App.—Houston [14th Dist.] 1997, writ dism'd by agr.). Appellate courts review pure questions of law *de novo. See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999); *Barber v. Colorado Independent School Dist.,* 901 S.W.2d 447, 450 (Tex.1995); *Matter of Humphreys,* 880 S.W.2d 402, 404 (Tex.1994). Global had no right to recover for Bridgepoint's injury. The trial court erred by entering judgment based on an invalid assignment in favor of Global as assignee. In so doing, the trial court made an error of law that caused the rendition of an improper judgment, and we, therefore, reverse. *See* TEX.R.APP.P. 44.1(a)(1).[8]

 When a plaintiff recovers as an assignee under an assignment later found invalid, the appellate court should reverse and render a take nothing judgment against that plaintiff. *See Gandy,* 925 S.W.2d at 696, 720. Accordingly, we render judgment that Global take nothing on the causes of action it prosecuted as assignee of Bridgepoint. *See* TEX.R.APP.P. 43.3.

One of the evils fostered by assignment of causes of action between parties is the skewing of the dynamics of the trial, whereby a defendant argues for high damages or a plaintiff seeks exoneration of a defendant he has sued. Because we find

---

8. This is not a case in which the complaining party failed to bring the invalidity of the assignment to the attention of the trial court until after verdict was rendered. *See St. Paul Surplus Lines Ins. Co., Inc. v. Dal–Worth Tank Co., Inc.,* 974 S.W.2d 51, 53 (Tex.1998). The trial court made at least two pre-trial rulings on that issue, and thus, had ample opportunity to correct its error before the case was submitted to the jury and in time to make an appropriate ruling without having to order a new trial. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000); *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999); *St. Paul Surplus Ins. Co., Inc.,* 974 S.W.2d at 53.

**34**

that the error also probably caused rendition of an improper judgment resolving the other claims at issue in the case, we reverse the remaining portion of the suit and remand to the trial court for further proceedings consistent with this opinion. *See* Tex.R.App.P. 44.1(a)(1); *see also Elbaor,* 845 S.W.2d at 250–51 (stating that remedial measures cannot vitiate the harm caused by the existence of a Mary Carter agreement); *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 4 (Tex.1986) (holding that failure to disclose the existence of a Mary Carter agreement to the jury is harmful error as a matter of law); *General Motors Corp. v. Simmons,* 558 S.W.2d 855, 857–59 (Tex.1977) (holding that failure to disclose the existence of a Mary Carter agreement to the jury is harmful error as a matter of law), *overruled on other grounds by Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 427 (Tex.1984). Because of our disposition, we do not address appellants' remaining points.