# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00735-CV

## In re FH Partners, L.L.C.

## ORIGINAL PROCEEDING FROM TRAVIS COUNTY

## O P I N I O N

Relator FH Partners, L.L.C., has filed a petition for writ of mandamus to compel the district court[1] to enforce a contractual jury waiver by striking a jury demand of the real parties-in-interest, Superior Funding, Inc.; Wave-Tec Pools, Inc.; Nations Pool Supply, Inc.; Jason B. Herring and Kimberly McCormick a/k/a Kimberly A. Herring (collectively, the Real Parties). We will conditionally grant the writ.

## BACKGROUND

**The Loan and Security Agreement**

Real parties Superior, Wave-Tec, and Nations (the Pool Corporations) are affiliated corporations that formerly were in the business of selling, constructing, and financing customers' purchases of residential swimming pools.[2] Real party Jason B. Herring started the business in the

---

[1] The Hon. Rhonda Hurley.

[2] Wave-Tec marketed, sold, and, through contractors, constructed the pools. Superior provided financing for Wave-Tec customers through mortgage loans. Nations was the parts-buying arm of the business.

1990s, and at relevant times he and real party Kimberly A. McCormick (or Herring) were officers of the Pool Corporations. The record reflects that the business pursued a strategy of rapid expansion that relied heavily on financing by asset-based lenders, lenders who make extensions of credit secured by loans, accounts receivable, and other business assets. Among these lenders was State Bank. On April 30, 2004, the Pool Corporations, through Jason and Kimberly,[3] entered into a Loan and Security Agreement (Agreement) providing the corporations a $4 million line of credit (later increased to $4.9 million), secured by their customers' loan accounts and other business assets, and personally guaranteed by Jason and Kimberly. The term of the Agreement was for three years, or until April 30, 2007, or such earlier time as State Bank elected to terminate the Agreement in the event of default. Upon termination, any unpaid balance the Pool Corporations owed would become immediately due and payable.

In February 2006, State Bank determined that there was a shortfall of $1.6 million in the amount of security compared to the amount of the debt, constituting an event of default under the Agreement. To secure the shortfall amount, Jason caused Superior to pledge stock, and another corporation he owned or controlled, Grandview Inc., to pledge real property it owned. Ultimately, however, State Bank ceased to make any further advances under the Agreement after April 2006 and, in May of that year, gave formal notice of default, citing a now-$1.8 million shortfall and the failure to provide State Bank financial statements as required under the Agreement. State Bank gave the Pool Corporations until September 30, 2006, to come into compliance with the Agreement. It also

---

[3] We use their first names for clarity.

imposed additional requirements for increasing the security for the debt, including delivering at least five new customer accounts each week.

On December 21, 2006, in advance of a January 2007 merger with Prosperity Bancshares, State Bank's parent corporation sold and assigned the Agreement to FH Partners, P.C., the predecessor to relator FH Partners, L.L.C. (collectively and individually FH ). FH is apparently an affiliate of FirstCity Servicing Corporation, which specializes in purchasing, servicing and managing distressed debt. It is undisputed that State Bank did not seek or obtain the Real Parties' consent to the assignment.

Following the assignment, FirstCity, on FH's behalf, took the position that the Pool Corporations were in default, as State Bank had, and, like State Bank, did not make further advances under the Agreement. Although the parties proposed various debt restructuring or refinancing arrangements, including a proposal by Jason to securitize Pool Corporation customer loans, no such arrangements were ever agreed to.

**The First Suit**

In February 2007, the Pool Corporations, along with Grandview, sued State Bank, FH, FirstCity, and various individual defendants (the First Suit). They alleged that the defendants had breached contractual and tort duties in inducing the Pool Corporations to enter into the Agreement, declaring the Pool Corporations in default, refusing to make further advances under the Agreement, refusing to release or return collateral that the corporations purportedly could have used to obtain alternative financing, and taking various other actions allegedly restricting their access to cash and financing. They further alleged that these actions, in turn, deprived the business of the

3

working capital and financing necessary to sustain its operations, causing it to cease operations, incur liabilities to multiple customers and vendors, and suffer a mortal loss of goodwill and business reputation. Among numerous theories they advanced, the plaintiffs asserted that State Bank had no right to assign the Agreement to FH without the Pool Corporations' consent and that such consent was never obtained. Consequently, the plaintiffs asserted, the defendants breached the Agreement by purporting to effect the assignment without the Pool Corporations' consent and that State Bank committed fraud and negligent misrepresentation by representing that it had the authority to assign the Agreement when it did not.

The plaintiffs demanded a jury. The defendants filed a motion to strike the jury demand, citing a contractual jury waiver that constituted the last substantive paragraph of the Agreement, concluding on the same page where the Pool Corporations' signature lines began:

24.8 **Waiver of Trial by Jury. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO, OR ANY OF THEM, WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT**

**OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

The plaintiffs did not dispute that this jury-waiver provision was enforceable and applicable to their claims in the First Suit, and did not oppose the defendants' motion to strike their jury demand. *See In re Prudential Ins. Co.*, 148 S.W.3d 124, 130-35 (Tex. 2004) (compelling enforcement of contractual jury-waiver provision in face of arguments that provision was unenforceable on constitutional or public policy grounds and was not knowingly and voluntarily agreed to). The district court signed an agreed order striking the jury demand in July 2009. The case proceeded toward a bench trial setting during the last week of October 2009.

In September 2009, the plaintiffs non-suited their claims against FH and FirstCity. Thereafter, the case went to trial as scheduled before the Hon. Scott Jenkins. During trial, the plaintiffs dismissed all of their claims except for their fraud and negligent misrepresentation claims against State Bank. At the conclusion of trial, Judge Jenkins rendered a take-nothing judgment against the plaintiffs. No findings of fact and conclusion of law were prepared, nor does the record reflect that any were requested. This judgment is now final for appellate purposes.

**The Second (Present) Suit**

Meanwhile, in October 2007, FH had filed a separate action against the Real Parties to recover a debt of over $4.4 million that it alleged the Real Parties owed under the Agreement (the Second or Present Suit). On March 25, 2008, the Real Parties filed a counterclaim against FH complaining of essentially the same types of injuries they had claimed in the First Suit, including the allegedly wrongful refusal to make advances under the Agreement, retention of collateral,

and restriction of the Pool Corporations' access to financing and thus its ability to do business. With their counterclaim, the Real Parties also filed a jury demand.

Three days thereafter, on March 28, the district court granted FH a temporary injunction restraining the Real Parties from collecting any payments on their customers' notes that were in FH's physical possession; interfering with FH's collection of payments; selling, refinancing, or pledging the notes; or "modifying, altering, secreting, tampering with, or otherwise manipulating [the Pool Corporations'] books and records regarding the Notes." The court set a trial date for October 27, 2008 on FH's claims for damages and permanent injunctive relief.

Over the next two-and-a-half years, FH and the Real Parties obtained a total of five agreed continuances of the trial setting and extensions of the temporary injunction. In each agreed motion seeking continuance, the parties explicitly acknowledged that FH, by joining in the motion, was not waiving its right to contest the Real Parties' jury demand. A similar statement appeared in each agreed order granting the continuances. FH ultimately did not file a motion to strike the Real Parties' jury demand until May 24, 2010. The timing of FH's filing complied with an April 22, 2010 agreed scheduling order that had set a deadline of June 15, 2010 for FH to file that motion. Subsequently, a September 17, 2010 amended agreed scheduling order—signed on the same date as the most recent agreed continuance order—set a deadline of November 3, 2010 for FH to have its motion to strike heard. The record reflects that FH made a request for the hearing on the same date, September 17, 2010, and that it obtained a hearing for November 3. The hearing went forward at that time.

6

As with the defendants' motion to strike the jury demand in the First Suit, FH's motion in the Second Suit was based on the Agreement's jury-waiver provision, which FH claimed the right to enforce as State Bank's assignee.[4] While not disputing that the jury-waiver provision had been valid and enforceable as to State Bank, the Real Parties argued that State Bank's rights under the Agreement had not been validly assigned to FH because they had never consented to the assignment. Consequently, the Real Parties urged, they never formed an agreement with FH (as opposed to State Bank) to waive their right to jury trial of any claims against it. At a minimum, the Real Parties insisted, "fact issues" remained as to whether the Agreement was assignable without their consent. FH joined issue by arguing that State Bank's rights under the Agreement could be assigned without the Real Parties' consent and that the Real Parties were barred by collateral estoppel from contending otherwise because the assignment's validity had been fully and fairly litigated in the First Suit.

Evidently persuaded by the Real Parties that some sort of factual determination was necessary to determine whether or not the Agreement had been assignable without the Real Parties' consent, the district court refused to grant FH's motion to strike the Real Parties' jury demand and instead opted to carry the motion to trial—a jury trial set for January 24, 2011—effectively depriving FH of any rights it would possess under the jury-waiver provision. *Cf. Prudential Ins. Co.*,

---

[4] FH has not raised, and we do not address, whether the jury-waiver provision might be enforceable against the Real Parties under theories other than contractual assignment. *See, e.g.*, *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305-08 (Tex. 2006) (discussing application of equitable estoppel to enforce arbitration agreement on behalf of non-signatory against signatory); *see also In re Prudential Ins. Co.*, 148 S.W.3d 124, 131-35 (Tex. 2004) (looking to principles governing arbitration agreements—like contractual jury waivers, a type of forum-selection agreement—in determining enforceability of jury-waiver provision).

7

148 S.W.3d at 138 (explaining that "[i]n no real sense" can a trial court's denial of a party's contractual right to have the other party waive a jury "ever be rectified on appeal . . . . [e]ven if [the party] could somehow obtain reversal based on the denial of its contractual right, it would already have lost a part of it by having been subject to the procedure it agreed to waive").

FH filed its mandamus petition within ten days thereafter. We requested a response from the Real Parties and set the cause for oral argument on January 12, 2011. In advance of oral argument, FH requested an emergency stay of trial court proceedings, including the January 24 jury trial setting, which we granted pending our resolution of its petition.

**ANALYSIS**

A writ of mandamus may issue to correct a trial court's clear abuse of discretion or violation of duty imposed by law where no "adequate" remedy by appeal exists. *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). A clear abuse of discretion occurs when the trial court's decision is so arbitrary and capricious that it amounts to clear error. *See id.* Because a trial court has no "discretion" in determining what the law is, it is said to "abuse its discretion" if it interprets or applies the law incorrectly. *See id*. at 840. A trial court's abuse of discretion in failing or refusing to enforce a valid contractual jury waiver is remediable by mandamus. *See Prudential Ins. Co.*, 148 S.W.3d at 135-40.

Bringing forward its arguments from below, FH urges that the district court abused its discretion in refusing to enforce the Agreement's jury-waiver provision because the assignment validly conveyed to it State Bank's rights under the Agreement and because collateral estoppel bars the Real Parties from contending otherwise. In response, the Real Parties urge, as a threshold matter,

8

that we should deny FH's petition without reaching the merits because FH waived any entitlement to mandamus relief by failing to diligently pursue its motion to strike their jury demand.

**Waiver**

In contending that FH waived any right it would have possessed to enforce the jury-waiver provision through mandamus, the Real Parties emphasize the concepts that mandamus is an "extraordinary" remedy whose issuance is "largely controlled by equitable principles" and that equity "aids the diligent and not those who slumber on their rights." *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (quoting *Callahan v. Giles*, 155 S.W.2d 793, 795 (Tex. 1941)). As for how those concepts should be applied here, the Real Parties assert that this case is analogous to *Rivercenter*, in which the Texas Supreme Court held that a party had impliedly waived its rights to seek mandamus relief to enforce a contractual jury waiver by "wait[ing] over four months after the filing of the Defendants' jury demand before asserting any rights it may have had under the jury waiver provisions" and "[t]he record reveals no justification for this delay." *Id.* at 367-68. In the Real Parties' view, FH's "delay in asserting its alleged rights under the contractual jury waiver provision is much more egregious than the four month delay described in *Rivercenter*" because FH did not file its motion to strike until almost twenty-six months after the Real Parties demanded a jury (March 25, 2008 until May 24, 2010) and waited almost another four months to request a hearing (until September 17, 2010) and nearly another two-and-a-half months to obtain a ruling (until November 3, 2010). The Real Parties further urge us to infer that this "delay" was "intentional," "strategic," without "reasonable justification," and even "sanctionable," with no conceivable purpose

9

except "gamesmanship" to gain leverage in a fall 2010 mediation, disrupt pretrial preparations, and delay trial at the "eleventh hour."

The Real Parties' analysis of when or how one waives the right to seek mandamus relief is incomplete and inaccurate, both legally and factually. Implied waiver of a party's right that is remediable by mandamus, as the Texas Supreme Court has emphasized in decisions since *Rivercenter*, is not a function of the passage of time in and of itself, though the passage of time may be relevant, but more generally of facts and circumstances that "clearly demonstrate[]" the party's intent to waive its right through "either the intentional relinquishment of a known right" or intentional conduct "unequivocally inconsistent with claiming a known right." *In re Gen'l Electric Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (orig. proceeding) (citations omitted) (distinguishing *Rivercenter* and holding that party did not impliedly waive its right to enforce contractual jury waiver through mandamus). And it follows, as the supreme court has further explained, that "[t]here can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Id.*

As for the factual record, the Real Parties have ignored numerous intervening events that explain and justify FH's timing in litigating its motion to strike and inform the inferences that we can reasonably draw from FH's conduct. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811-12 (Tex. 2005) (discussing contextual evidence). These facts and circumstances include, most notably, a succession of continuance motions, continuance orders, and scheduling orders revealing that the parties—both FH and the Real Parties themselves—agreed to postpone adjudicating the Real Parties' entitlement to a jury trial while pursuing settlement and litigating the First Suit, ultimately agreed

10

to the very schedule FH followed in filing its motion to strike and having it heard, and joined

in repeatedly and consistently recognizing FH's ongoing intent to challenge the Real Parties' jury

demand in the event the case did not settle:

- **The September 30, 2008 agreed continuance.** In the first of their five agreed motions for continuance and extension of the temporary injunction, filed on September 30, 2008, the parties represented that they had "refrained from extensive discovery" because they had been attempting to settle both the Second Suit and the First Suit and "because of activity taking place" in the First Suit. They requested that the case be reset and the temporary injunction extended until July 20, 2009, "to allow for settlement negotiations." The agreed motion further indicated that FH, by agreeing to the motion, "is not waiving its right to contest Defendants' entitlement to a jury trial." On the same date, the district court granted the parties' motion by agreed order. The order, like the motion, explicitly acknowledged that FH "is not waiving its rights to contest Defendants' entitlement to a jury trial."

- **The February 20, 2009 agreed contingent joint scheduling order.** The parties agreed to, and the district court signed, a scheduling order governing the First Suit and, contingent on an order consolidating the two related cases, the Second Suit. The agreed order set a deadline of May 15, 2009, for the filing of motions to strike jury demands. There is no indication, however, that the two suits were ever consolidated.

- **The May 28, 2009 agreed continuance.** On May 27, 2009, the parties filed their second agreed motion for continuance and extension of the temporary injunction, requesting that trial be reset on October 26, 2009 (the same date as trial in the First Suit). As before, the parties represented that they had "refrained from extensive discovery" while negotiating to settle the two cases and "because of activity taking place" in the First Suit. And, once again, the parties acknowledged that FH "is not waiving its right to contest Defendants' entitlement to jury trial." On the following day, the district court granted the motion by agreed order, again noting that FH "is not waiving its rights to contest Defendants' entitlement to a jury trial."

- **The October 9, 2009 agreed continuance.** On October 8, 2009, the parties filed their third agreed motion for continuance and extension of the temporary injunction, requesting that trial be postponed until August 2, 2010. The parties advised that they had "refrained from extensive discovery" because they had been attempting to negotiate settlement and because of the Real Parties' pretrial preparations in the First Suit. Once again, the parties acknowledged that FH "is not waiving its right to contest Defendants' entitlement to jury trial." On the following day, the district court granted the motion by agreed order, again

11

acknowledging that FH "is not waiving its right to contest Defendants' entitlement to jury trial."

- **The April 22, 2010 agreed continuance.** On April 20, 2010, the parties filed their fourth agreed motion for continuance and extension of the temporary injunction, requesting that trial be reset until October 11, 2010. In this motion, unlike the previous ones, the parties advised that settlement negotiations had finally failed and that they "now intend to engage in full discovery in this case." As before, the agreed motion indicated that FH, by agreeing to the motion, "is not waiving its right to contest Defendants' entitlement to a jury trial." On April 22, the district court signed an agreed order granting the continuance and extension as requested, again stating that FH "is not waiving its rights to contest Defendants' entitlement to a jury trial."

- **The April 22, 2010 agreed scheduling order.** On the same date that it granted the fourth agreed continuance and extension, the district court also signed an agreed scheduling order. Among other pretrial deadlines, the parties and court agreed that FH would have until June 15, 2010 to file its motion to strike the Real Parties' jury demand. As previously noted, FH filed its motion to strike in advance of the deadline, on May 24, 2010.

- **The September 17, 2010 agreed continuance.** On September 17, 2010, the parties filed their fifth and most recent agreed motion for continuance and extension. In this motion, the parties requested that trial be further postponed in order to mediate the case. As before, the parties acknowledged that FH, by agreeing to the motion, "is not waiving its right to contest Defendants' entitlement to a jury trial," but also addressed the scheduling of a hearing on FH's motion to strike in the event mediation failed to yield settlement. "If mediation is unsuccessful," the parties advised, FH "intends to set a hearing on [its] Motion to Strike Jury Demand . . . for a date after mediation." Depending on the district court's ruling on the motion, the parties requested a trial date of January 17, 2011 for a bench trial or January 24, 2011 for jury trial. On the same date, the district court signed an agreed order granting the motion. Similar to the previous orders, the agreed order indicated that FH "is not waiving its right to a determination on its Motion to Strike the Jury Demand of [the Real Parties]." Also on the same day, as previously indicated, FH requested a hearing on its motion to strike.

- **The October 4, 2010 amended agreed scheduling order.** On October 4, 2010, the district court signed an amended agreed scheduling order that set a hearing on FH's motion to strike for November 3, 2010. As noted, the hearing went forward at that time.

These motions and orders—again, all of which were agreed to by the Real Parties—fall far short of "clearly demonstrating" that FH intentionally relinquished any right

12

it possessed to enforce the jury-waiver provision or engaged in intentional conduct "unequivocally inconsistent" with claiming that right. *See id.* To the contrary, the record affirmatively demonstrates FH's ongoing intent to assert that right. This record further reveals that FH's timing in pursuing its motion to strike was not the product of unexplained or unjustified delay, but of the parties' joint agreement to postpone resolution of the jury-waiver issue, along with discovery and other pretrial matters, while the parties attempted settlement or litigated the First Suit. Once the parties ultimately proceeded toward trial, they agreed to a schedule for FH to file its motion and have it heard, and FH fully complied with these deadlines.

The Real Parties have not attempted to controvert these facts—and, perhaps tellingly, they conspicuously omitted any mention of them when raising their waiver arguments in their response to FH's petition despite obviously being aware of them; we learned of these facts only when FH filed a reply and supplemental appendix. When confronted with these facts during oral argument, the Real Parties conceded that FH did not waive any rights it possessed to seek enforcement of the jury-waiver provision at the trial level, but attempted to argue that FH somehow still waived its right to seek mandamus relief in the event the district court refused to enforce the jury-waiver provision (as it ultimately did). In the Real Parties' view, in other words, the parties' numerous agreed continuance motions, agreed continuance orders, and agreed scheduling orders demonstrate FH's intent to seek a district court ruling on its motion to strike while also abandoning the right to appellate relief that would ensure the district court's ruling complied with the law. The Real Parties' proposed distinction between FH's intent to enforce the jury-waiver provision at the trial versus appellate levels finds no support in either the record or Texas law. *See id.* We hold that

13

FH did not waive its right to seek mandamus to enforce any rights it possesses under the Agreement's jury-waiver provision.

**Assignment**

We now turn to the merits of FH's arguments that the district court abused its discretion in refusing to enforce the Agreement's jury-waiver provision. We agree with FH that State Bank's rights under that provision were validly assigned to it as a matter of law, and do not reach FH's contention that collateral estoppel bars the Real Parties from arguing otherwise. *See* Tex. R. App. P. 47.1, 52.8(d).

The parties concur that the validity of the assignment of State Bank's rights under the jury-waiver provision turns on whether State Bank was required to obtain the Real Parties' consent in order to assign the Agreement to FH.[5] Although the Agreement contains no terms that explicitly either authorize or prohibit assignment, the presumption or general rule under Texas law, as FH emphasizes, is that all contracts are freely assignable. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 596 (Tex. 1992); *Dittman v. Model Baking Co.*, 271 S.W. 76, 77 (Tex. Comm'n App. 1925, judgm't adopted).[6] Similarly, it is the longstanding rule in Texas that

---

[5] FH does not contend that State Bank's rights under the Agreement's jury-waiver provision were severable and assignable independently from the other rights purportedly conveyed by the assignment. *Cf. Southern Cmty. Gas Co. v. Houston Natural Gas Corp.*, 197 S.W.2d 488, 490 (Tex. Civ. App.—San Antonio 1946, writ ref'd) (determining that contract provision sought to be specifically enforced was severable and, standing alone, assignable). We express no opinion as to whether they would be.

[6] *Cf. Reef v. Mills Novelty Co.*, 89 S.W.2d 210, 211 (Tex. 1936) (giving effect to explicit prohibition against assignment of salesman's right to commissions without employer's consent); *Zale Corp. v. Decorama*, 470 S.W.2d 406, 408-09 (Tex. Civ. App.—Waco 1971, writ ref'd n.r.e.) (giving effect to contract provision that explicitly authorized assignment).

14

the right to collect a debt—including not only debts based in contract but also the broader category of rights to recover money known as choses in action—is generally assignable. *See State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 705-07 (Tex. 1996); *Citizens State Bank of Houston v. O'Leary*, 167 S.W.2d 719, 721 (Tex. 1942). These principles date back to the English antecedents of Texas common law, and embody public policies favoring alienability and trade of legal rights to achieve economic benefit, in derogation of older concepts that rights are unique to particular parties and particular situations. *See Gandy*, 925 S.W.2d at 705-07; *see also O'Leary*, 167 S.W.2d at 721 ("It is not the policy of the law of this State to favor restraints upon the alienation of property. Our courts have held that any species of property is assignable, and that everything which may be called a debt may be assigned . . . ." (internal quotations omitted)); *Magnolia Petroleum Co. v. Havoline Auto Supply Co.*, 172 S.W. 759, 761 (Tex. Civ. App.—Dallas 1914, no writ) ("At the present day, no doubt, an agreement to pay money, or to deliver goods, may be assigned by the person to whom the money is to be paid or the goods are to be delivered, if there is nothing in the terms of the contract . . . which manifests the intention of the parties that it shall not be assignable." (quoting *Arkansas Smelting Co. v. Belden Mining Co.*, 127 U.S. 379, 387 (1888))).

While acknowledging that "[a]s a general rule . . . contracts are assignable absent a restriction preventing their sale or assignment," the Real Parties attempt to distinguish the rights assigned to FH by suggesting that the "general rule" derives solely from contract language specifically allowing assignment,[7] the negotiability of the instrument in question,[8] or statutes that

---

[7] *See Zale Corp.*, 470 S.W.2d at 408-09.

[8] *See Vernor v. Southwest Fed. Land Bank*, 77 S.W.2d 364, 366 (Tex. App.—San Antonio 2002, pet. denied) (promissory note was assignable by original lender without debtor's consent). At some length, the Real Parties argue that the Agreement is not a negotiable instrument.

15

have been repealed or do not apply here,[9] as opposed to the Texas common or decisional law

on which FH relies.[10] These arguments misconstrue the jurisprudence and its historical roots. *See*

*Gandy*, 925 S.W.2d at 706-07 (surveying historical evolution of assignability of rights in equity and

common law and noting that Texas decisional law has long permitted assignments of non-negotiable

instruments and "rights not covered by the statute" (citing *Kelley v. Bluff Creek Oil Co*, 309 S.W.2d

208, 212 (Tex. 1958); *O'Leary*, 167 S.W.2d at 721)); *Dittman*, 271 S.W. at 77 ("At one time no non-

negotiable obligation was assignable. But this was by reason of a state and stage of society and a

dominant sentiment that have long passed. The doctrine has been abandoned even in theory.").

But the primary means by which the Real Parties have attempted to avoid the general

rule is by invoking a long-recognized exception that applies when a contract is said to "rel[y] on the

personal trust, confidence, skill, character or credit of the parties." *See Crim Truck & Tractor Co.*,

823 S.W.2d at 596. The notion underlying this "personal trust . . . or credit" exception is that the

general policy of free assignment should yield to a contracting party's interest in choosing the person

with whom it deals with respect to certain types of contractual rights or duties that, by their nature,

---

[9] The Real Parties correctly observe that numerous older Texas cases addressing assignability of contracts reference a statute—on the books between 1840 and the legislature's 1965 enactment of the U.C.C.—that explicitly made assignable "any instrument not negotiable by the law merchant." *See, e.g.*, *Reef*, 89 S.W.2d at 211; *Dittman v. Model Baking Co.*, 271 S.W. 76, 77 (Tex. Comm'n App. 1925, judgm't adopted); *see also* Act approved Jan. 25, 1840, 4th Cong., R.S., §§ 1-4, 1840 Rep. Tex. Laws 144, 144-46, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 318-20 (Austin, Gammel Book Co. 1898) (formerly at Tex. Rev. Civ. Stat. Ann. arts. 568-71 (Vernon 1948)), *repealed by* Act of May 19, 1965, 59th Leg., R.S., ch. 721, § 10-102, 1965 Tex. Gen. Laws 1, 179-80.

[10] Although it briefly alluded to the U.C.C. during oral argument, FH did not assert in its mandamus briefing that the U.C.C. makes the Agreement assignable, nor does the record indicate that it ever did below. Instead, FH has relied solely on the above Texas common law or equitable concepts that govern assignability of contract rights.

contemplate or require performance only by a specific person. *See Menger v. Ward*, 30 S.W. 853, 855 (Tex. 1895) ("Rights arising out of a contract can not be transferred if they involve a relation of personal confidence, such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided."). These types of rights or duties:

> arise on account of suretyship; technical guaranty; personal relationship, as between master and servant; personal skill or services, as in such a case, or that of an attorney for his client; personal terms of contract, as where a particular obligee is made the measure of performance, the agreement is to supply what he "needs," or he is to be "satisfied"; or confidence or trust, as from lender toward borrower—it being everywhere conceded that in such instances a man has a right to choose the individuals with whom he will deal.

*See Dittman*, 271 S.W. at 77. "But, saving exceptions of these kinds, the full and unexceptional liberty of restricting alienation of contractual rights has given way," and Texas law has long been said to be quite "liberal" in favoring assignment. *Id.* at 77-78 (citing numerous examples of contractual rights and duties held to be assignable, including "such obligations as to clean city streets, to keep railroad cars in repair, to erect and operate a mill," "to supply hops of a certain standard," "to insure against fire," "to paint, paper, and whitewash a house," "to construct and operate a street railway extension for five years in behalf of a land company owning a city addition," "to maintain a switch and furnish cars and freight service at a lumber mill," and to construct an oven).

The Real Parties have attempted to rely on what is perhaps the most common application of the "personal trust . . . or credit" exception. Texas courts have long held that a debtor

17

cannot assign an extension of credit or delegate its duty to pay a creditor without the creditor's consent. *See Menger*, 30 S.W. at 855; *Lancaster v. Greer*, 572 S.W.2d 787, 789-90 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.); *Magnolia Petroleum Co.*, 172 S.W. at 761. This reflects a view that a creditor's agreement to extend credit inherently contemplates a specific debtor and that the creditor should not be effectively forced to extend credit to a different debtor without the creditor's consent. *See Menger*, 30 S.W. at 855 ("In the relation of debtor and creditor there is more than simply the financial ability of the debtor and the value of the security given; the character of the man is oftentimes worth more than his property as an assurance of prompt payment, and security of that which he holds upon the lien exists. But it is useless to speculate upon reasons that might be assigned why a creditor might prefer one man to another as his debtor; it is his right to make his own contracts, with which courts can not interfere except to enforce them as made."); *Lancaster*, 572 S.W.2d at 790 ("The rationale . . . is that credit contracts by their very nature involve a relationship between the seller and buyer of personal confidence and trust, such that the seller [who extends credit] must have intended the rights conferred by the contract to be exercised only by him in whom he actually confided."); *Magnolia Petroleum Co.*, 172 S.W. at 761 (although party "was willing to give credit to [the debtor], it does not follow that he was willing to give credit to [the debtor's assignee]. It could not be forced to do so by a mere assignment of the contract.").

The Real Parties urge that this rule applies equally to prevent creditors from assigning their contractual rights against debtors without the debtors' consent, not just debtors from unilaterally assigning their obligations to someone else. While acknowledging that the cases have typically proscribed attempted assignments by debtors rather than creditors, the Real Parties urge that "the

18

case law expressly and repeatedly expresses the rule both bilaterally and in the plural." In support, they cite instances where Texas courts, when referencing the "personal trust . . . or credit" exception, have used phrases like "contracts involving the extension of credit" or "providing for credit between the parties" without immediately specifying whether they are referring to assignments by debtors or creditors.[11] From this, the Real Parties conclude that the "personal trust . . . or credit" exception is implicated here because the Agreement "involves" an "extension of credit"—State Bank's extension of credit to them—and any distinctions between State Bank's right to receive payment versus the Real Parties' obligations to make the payments are immaterial.

FH insists that while the "personal trust . . . or credit" exception prevents debtors from unilaterally assigning their obligations without creditors' consent, it does not apply in the same way to restrict a creditor from assigning its corresponding rights against the debtor. We agree with FH—the exception and its underlying rationale do not extend to a creditor's assignment of its right to receive payment from a debtor. *Vernor v. Southwest Fed. Land Bank*, 77 S.W.2d 364, 366 (Tex. App.—San Antonio 2002, pet. denied) (rejecting defaulting debtors' argument that promissory note involved "personal credit" and, therefore, could not be assigned by original lender; "[o]nly the [debtors'] credit is implicated, not the bank's");[12] *see Dittman*, 271 S.W. at 77 (exception applied

---

[11] *See, e.g.*, *Zale Corp.*, 470 S.W.2d at 408 ("An exception to this rule is that a contract providing for credit between the parties is not assignable."); *Southern Cmty. Gas Co.*, 197 S.W.2d at 489 ("A contract providing for credit between the parties is not assignable."); *Ampsco Pipeline Co. v. Donico Prod. Co.*, 112 S.W.2d 483, 485 (Tex. Civ. App.—San Antonio 1938, writ dism'd) (". . . the well-established exception to the general rule of assignability—that is, where the contract involves the extension of credit.").

[12] The Real Parties urge that *Vernor* hinged on the negotiability of the promissory note at issue. It didn't, and such a distinction, as previously noted, is unavailing. *See Vernor*, 77 S.W.2d at 366; *see also Gandy*, 925 S.W.2d at 706-07.

19

to contracts relying on "confidence or trust, as *from lender toward borrower*" (emphasis added)).[13]

There is simply no Texas authority holding that a creditor's right to receive payment on a debt is the sort of contractual right that Texas law regards as being predicated on a debtor's "personal trust . . . or credit" in a creditor, such that the creditor cannot freely assign that right. *See Vernor*, 77 S.W.2d at 366. Indeed, as we previously noted, the right to receive payment on a debt has long been considered among the types of rights that Texas law deems freely assignable. *See Gandy*, 925 S.W.2d at 705-07. The citations the Real Parties portray as establishing the "bilateral" or "plural" application of the exception to debtors turn out to be dicta or out-of-context quotations, not holdings.[14] No Texas court has so held and, lacking such authority, we will not be the first.

On the other hand, the Real Parties have insisted that, whatever the general rules regarding assignments by creditors versus debtors might be, the Agreement nevertheless uniquely "relied" on their "trust" and "confidence" in State Bank's "personal" "skill," "character," or "credit," so as not to be assignable without their consent. Although they insist that such "reliance" is established as a matter of law within the "four corners" of the Agreement, they rely primarily on evidence of what they term "facts and circumstances surrounding the formation of the contract" that, in their view, raises "fact issues" in this regard. This evidence consists principally of an affidavit prepared by Jason Herring. The gravamen of Jason's testimony is that he had sought out a lender

---

[13] *See also* Restatement (Second) Contracts § 317 cmt. d (1981) ("When the obligor's duty is to pay money, a change in the person to whom the payment is to be made is ordinarily not material.").

[14] The Real Parties also assert that this basic distinction between the assignability of debtors' obligations versus creditors' rights "is a patent violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution." However, they offer no authorities or analysis to support that novel proposition. *See* Tex. R. App. P. 52.3(h), 52.4(d).

that (in addition to possessing sound "character" and "credit") was knowledgeable, experienced, and committed to the sort of asset-based financing that had fueled the business's past growth and success; that he had determined that State Bank and its personnel fit the bill; that the Pool Corporations executed the Agreement (and the guarantors the guarantee) in reliance on this "personal trust" and "confidence" in State Bank's "skill," "character," or "credit;" and that they would not have contracted with "any bank or commercial lender who was not heavily committed to asset-based lending as a substantial part of its core business" or "small, inexperienced or improperly motivated lenders."[15] The Real Parties also point to evidence to the effect that the business model or strategy of FH and/or FirstCity was not asset-based lending, but purchasing of bad debt and resolving it for more than it paid. As FH suggests, the Real Parties' view of the "personal trust . . . or credit" exception is flawed in numerous respects.

Contrary to the Real Parties' view, application of the exception does not turn on a particular party's subjective "trust" or "reliance" upon entering into a particular contract, but on whether the rights it conveys to the other party are a type that Texas law regards as "involving a relation of personal confidence" such that the other party should not be permitted to unilaterally substitute another for itself through assignment. *See Menger*, 30 S.W. at 855; *Dittman*, 271 S.W. at 77-78. And to determine the nature of the rights the parties have conveyed, we begin (as with any issue of contract construction or interpretation) with the Agreement's language, the objective manifestation of their intent. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12

---

[15] FH objected below that Herring's testimony was incompetent because it consisted of parol evidence and unsupported legal or factual conclusions.

(Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If a contract can be given a certain or definite legal meaning or interpretation, it is not ambiguous and is construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

There is no ambiguity regarding the terms of the Agreement that are material to whether the "personal trust . . . or credit" exception applies. To summarize those terms, State Bank agreed to extend a line of credit to the Pool Corporations (specifically, Superior) over a three-year period, subject to earlier termination in the event of default. The debt was to be secured by customer loan accounts and other assets of the business. The size of advances or draws the Pool Corporations could obtain was tied to the value of their customer accounts that secured their indebtedness, capped by an aggregate limit, and subject to adjustments by State Bank based on events of default or other developments it perceived to negatively impact its security interest. In turn, the Pool Corporations were required to pay back the debt, plus interest, with the entire outstanding indebtedness coming due and payable upon termination. By the time of State Bank's assignment to FH, as previously noted, the Pool Corporations had drawn millions under the line of credit, and State Bank had declared the Real Parties to be in default and ceased to make further advances. FH and FirstCity followed a similar course through the Agreement's eventual termination.

A creditor's agreement to extend credit and receive payment on a debt, again, has long been held to be assignable by the creditor. *See Gandy*, 925 S.W.2d at 705-07; *Vernor*, 77 S.W.2d at 366. In urging that the Agreement conferred additional rights on State Bank that

22

implicate the "personal trust . . . or credit" exception, the Real Parties allude generally to terms

that, in their view, afford State Bank "discretion" or "judgment" in regard to "what collateral would

be accepted for the borrowing base," "the bank's possession and release of loan files," "the bank's

collection and allocation of the borrower's income," and "[t]he size of the loan" or adjustments in

the lending base or limit. They also emphasize what they portray as the "long-term," "ongoing," and

"complex" nature of the "relationship"—a three-year line of credit, as contrasted with a one-time

loan or credit sale. Their basic reasoning seems to be that because the Agreement, as they see it,

was one-sided (echoing a theme from the First Suit) and placed their business financially at

the mercy of State Bank to "cooperate" and "deal fairly and intelligently with them and in a manner

that would support their business model," it reflects that they necessarily relied on "trust" or

"confidence" in State Bank's unique attributes, "skill," "character" or "credit" when agreeing to

those terms. Leaving aside that the terms of the Agreement arguably negate this sort of reliance,[16]

the Real Parties refer us to no authority holding that a lender's discretion in regard to making

advances under a line of credit comes within the sorts of contractual rights that Texas law regards

---

[16] Among other features, the Agreement contains a merger clause providing that the Agreement "supersedes all other agreements and understandings between the parties hereto . . . relating to the subject matter hereof," disclaiming any promises by State Bank to induce the Real Parties into the Agreement, and agreeing that "[n]o course of dealing, course of performance or trade usage, and no parol[] evidence of any nature, shall be used to supplement or modify any terms." Furthermore, while the Real Parties dispute its enforceability, it remains that the Real Parties agreed to "**RELEASE[], EXCULPATE[], AND INDEMNIF[Y] [STATE BANK] . . . FROM ANY AND ALL LIABILITY ARISING FROM ANY ACTS BY ANY ENTITY, INCLUDING LENDER, UNDER THIS AGREEMENT OR IN FURTHERANCE THEREOF . . . .**" *See Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 868-75 (Tex. App.—2006, pet. granted, remanded by agr.) (op. on reh'g) (applying *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179-80 (Tex. 1997), and *Prudential Ins. Co. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex. 1995)).

as "involving a relation of personal confidence" such that the lender should not be permitted to unilaterally substitute another for itself through assignment. We further observe that even if the Real Parties' arguments concerning State Bank's "discretion" otherwise had merit, the principal contractual right assigned to FH was the right to collect the Real Parties' debt—quintessentially among the types of rights that Texas law deems freely assignable. *See Heffington v. Hellums*, 212 S.W.2d 245, 248 (Tex. Civ. App.—Austin 1948, writ ref'd n.r.e.) ("The only substantial rights passing by the assignment then were the debt due [the creditors and assignors] . . . . There can be no question but that the debt due [the creditors] was assignable, for it has been held that 'everything which may be called a debt may be assigned.'" (quoting 5 Tex. Jur. *Assignments* § 6 (1930))).

In short, the rights conferred to State Bank under the Agreement and assigned to FH do not, as a matter of law, implicate the "personal trust . . . or credit" exception to the general Texas rule favoring free assignment of contract rights. Nothing in the Real Parties' evidence of "facts and circumstances surrounding the formation of the contract" can alter this conclusion. This proof, even if competent, would not be material to whether the contract rights assigned to FH are the type to which the exception applies. *See Menger*, 30 S.W. at 855; *Dittman*, 271 S.W. at 77-78.

Because State Bank was not required to obtain the Real Parties' consent for the assignment, the absence of such consent cannot render the assignment invalid. As there has been no other basis presented for holding the assignment invalid, FH, as State Bank's assignee, owns the right to enforce the Agreement's jury-waiver provision. *See, e.g.*, *Thweat v. Jackson*, 838 S.W.2d 725, 727 (Tex. App.—Austin 1992) ("[I]t is axiomatic that an assignee . . . stands in the shoes of the assignor and obtains the right, title, and interest that the assignor had at the time of the assignment."),

*aff'd*, 883 S.W.2d 171 (Tex. 1994). By refusing to enforce FH's rights under this provision by granting its motion to strike the Real Parties' jury demand, the district court abused its discretion. *See Prudential Ins. Co.*, 148 S.W.3d at 135-40.

## CONCLUSION

We conditionally grant FH's petition for writ of mandamus. The writ will issue only if the district court fails to comply with this opinion. The stay of proceedings issued by this Court will remain in effect until the district court complies with this opinion.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Filed:   February 17, 2011